```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re OTAL INVESTMENTS LTD., as Owner    :
of the M/V KARIBA, for Exoneration from or  :     AMENDED
                                         :        OPINION &
Limitation of Liability                  :        ORDER
------------------------------------------------------------x
OTAL INVESTMENTS LTD.,                   :
                                         :
           Third-Party                   :
           Plaintiff,                    :
                                         :
         - against -                     :        03 Civ. 4304
                                         :
CAPITAL BANK PUBLIC LTD. CO.,            :
ACTINOR CAR CARRIER I AS,                :
WILH. WILHELMSEN ASA, WALLENIUS          :
WILHELMSEN LINES,                        :
CLARY SHIPPING PTE. LTD.,                :
MST MINERALIEN SCHIFFAHRT                :
SPEDITION UND TRANSPORT GMBH, &          :
MINERAL SHIPPING CO. PRIVATE LTD.,       :
                                         :
           Third-Party                   :
           Defendants,                   :
------------------------------------------------------------x
AUGUSTA ASSICURAZIONI S.p.A.,            :
                                         :
           Plaintiff,                    :
                                         :
         - against -                     :        03 Civ. 9962
                                         :
WALLENIUS WILHELMSEN LINES AS, et al.,   :
                                         :
           Defendants,                   :
------------------------------------------------------------x
ZURICH INSURANCE CO., et al.,            :
                                         :
           Plaintiffs,                   :
                                         :
         - against -                     :        04 Civ. 1107
                                         :
M/V TRICOLOR, et al.,                    :
                                         :
           Defendants,                   :
------------------------------------------------------------x
```

1

**Hon. HAROLD BAER, JR., District Judge:**

I. **BACKGROUND**

On June 12, 2003, Otal Investments Ltd. ("Otal"), owner of the M/V Kariba ("Kariba") filed a Complaint for exoneration or limitation of liability with respect to claims against it that arose from a collision between the Kariba and the M/V Tricolor on a foggy early morning in the English Channel. A trial to determine and apportion liability was held on October 17 – October 21, 2005 and after post-trial briefs were submitted, the Court heard closing arguments on December 12, 2005.

Parties to this action include Third-Party Defendants, Clary Shipping Pte. Ltd., MST Mineralien Schiffahrt Spedition und Transport GmbH, Mineral Shipping Co. Private Ltd., owners of the M/V Clary (collectively "Clary"), and Capital Bank Public Limited Company, Actinor Car Carrier I AS, Wilh. Wilhelmsen ASA and Wallenius Wilhelmsen Lines AS, owners of the M/V Tricolor (collectively "Tricolor"). Also involved in this matter are various owners of damaged cargo (collectively "Cargo Claimants").

Previously, this Court held that a stipulation between the parties (including the various Cargo Claimants) that stated "Article 4 of the Brussels Collision Convention of 1910 applies to this action" and therefore "liability, if any, for claims between and among cargo interests, Otal, the Tricolor Interests and/or the Clary Interests shall be determined in accordance with the 1910 Collision Convention" meant that the parties had only contemplated the use of Article 4 of the Convention. In re Otal Invs. Ltd., 2005 U.S. Dist. LEXIS 13321 (S.D.N.Y. July 7, 2005)(Baer, J.). In a later Opinion, this Court determined that Article 6 of the Brussels Collision Convention abolished legal presumptions with regard to fault and precluded any application of the rule that emanated from The Pennsylvania, 86 U.S. 125 (1874) ("the Pennsylvania Rule"). In that case, and the rule it spawned, violation of a statutory rule intended to prevent collisions raises a presumption that the violation was a cause of the casualty. In re Otal Invs. Ltd., 2005 U.S. Dist. LEXIS 21580 (S.D.N.Y. Sept. 29, 2005)(Baer, J.).

## II. FINDINGS OF FACT

Early in the morning of December 14, 2002, the Kariba, Tricolor, and Clary, along with several other unidentified vessels, were navigating in a Traffic Separation Scheme ("TSS") in the English Channel North of Dunkerque, France. The vessels were operating in restricted visibility due to fog. By approximately 2:05 a.m., both the Kariba and Tricolor had steadied on roughly parallel courses in the westbound lane of the West Hinder branch of the TSS. Both vessels had just made a turn at the Fairy South buoy and were navigating from way-point to way-point in their planned courses. At this same time, the Clary was also proceeding on a steady course in the northbound lane of the intersecting branch of the TSS. Tricolor was in the process of overtaking Kariba approximately half a mile off Kariba's starboard quarter. When Kariba and Clary were just about three miles apart on intersecting courses, Kariba made an abrupt turn to starboard and hit the port side of Tricolor, causing her to capsize and sink along with her cargo. Fortunately, there were no human casualties and the entire crew of the Tricolor made it safely on board the Kariba and another passing vessel.

Generally, Kariba argues that it was boxed in by the Clary and Tricolor and those vessels are at least partly to blame for the collision. There is no dispute that it was the duty of the Clary, as the vessel intersecting the West-bound TSS, to turn to starboard and go safely astern of the Kariba and Tricolor, and that is what the Clary did, but allegedly later than it should have and not before the Kariba turned to starboard and put itself on a collision course with the Tricolor.

As the three vessels navigated in a TSS they were tracked by Sofrelog, a shore-based radar located at Dunkerque, France. A series of images was obtained from data stored by the Dunkerque radar system. These images provided a common reference point to display the approximate positions of all three vessels in the moments leading up to and just after the collision.[1] While there is a time lag to reflect course and speed change of

---

[1] Sofrelog images were updated every five seconds, and were used by the parties' experts to estimate course over ground ("COG"), and speed over ground ("SOG"). (Hempstead Report. Ex. 372; Boyce Decl. ¶ 6; Ex. 378; Torborg Report at 4, Ex. 2042.) The experts also have reconstructed the distances between the vessels as well as Closest Point of Approach ("CPA"), and Time of the Closest Point of Approach ("TCPA").

the vessels tracked, for the most part the Sofrelog images accurately reflect the approximate location of each vessel.[2]

### A. The Situation on the Kariba

The Kariba was a Bahamas-flagged container ship, built in 1982, with an overall length of 175.75 meters and a container carrying capacity of about 1200 TEU.[3] On December 13, 2002, Kariba voyaged from Antwerp, Belgium to Le Harve, France, eventually bound for West African ports with containers loaded at Antwerp and other European ports.

At the time of the collision, Captain Kamola was on the bridge and maintained watch on Kariba's radar, which had a fully functioning Automatic Radar Plotting Aid ("ARPA").[4] The Kariba was traveling approximately 16 knots over ground. This was Captain Kamola's first voyage as a Master in restricted visibility and he had been on watch for seventeen hours. (Tr. 76:16-18, 78:23-25.) Also on the bridge with Captain Kamola were Second Officer Maciej Szymanski and Able-Bodied Seaman Albert Ignacio.

At roughly 1:55 a.m., prior to reaching the Fairy South Buoy, a place where Kariba and Tricolor, as well as the other vessels in the TSS, executed a starboard turn to approximately 290º, Captain Kamola noticed a northbound vessel, the Clary, coming up on the port bow. (Kamola Decl. ¶39; Tr. 83:21 – 84:01-09.) At approximately 2:00 a.m., the Kariba made its turn and steadied on a northwest bound course of approximately 290º. (Sofrelog Ex. 428-A.) Captain Kamola testified that he was concerned that this turn would place Kariba on a collision course with the Clary but at this point the Clary was still at least five miles away. Captain Kamola testified further that he expected the Clary to turn to starboard at some point to avoid collision. (Id.) The Tricolor followed

---

[2] Kariba's expert Captain Douglas Hard estimated the lag time to be one minute (Tr. 717:05-13, 7:20 – 721:06.) and Clary's expert, Captain Brian Boyce estimated forty-five seconds (Tr. 898:01-19.). The lag time represents the period between the time a vessel actually maneuvers until the time the maneuver is detected by the ARPA and visually displayed on the radar screen. For purposes of this Opinion, I will approximate the actual time the vessels maneuvered.
[3] TEU stands for Twenty-foot Equivalent Unit Capacity. Each TEU reflects one 6.1m/20ft container.
[4] ARPA is a computer system that automatically tracks and plots target vessels and calculates their courses and speeds, and predicts the Closest Point of Approach ("CPA") of each vessel. There is a time lag between a ship's maneuver to change course and speed and the display of that maneuver on ARPA.

the Kariba and executed a similar turn from about 253º to 290º and was at that point about .8 miles behind Kariba. (Id.) Captain Kamola testified that he knew the Tricolor would overtake Kariba on its starboard quarter. (Tr. 150:14-19.)

At about 2:04 a.m. Captain Kamola pointed out the radar echo of Clary to Second Officer Szymanski and told him to go out on the port wing to look for Clary's lights. Second Officer Szymanski took his binoculars and stayed out on the wing for about two minutes. When he returned he reported that he had not seen any lights.

At around 2:09 a.m. Captain Kamola decided that he had waited too long for Clary to turn and he would have to act to avoid collision. Although he had performed no trial maneuvers on his ARPA, Kamola ordered a course change of 10º to starboard which registered on the Dunkerque radar at 2:09:45 a.m. (Tr. 97:12-24; Sofrelog Ex. 428-A.) This took the Kariba from approximately 290º to 300º. Captain Kamola had Second Officer Szymanski go out on the starboard wing of the bridge to look for any lights. (Szymanski Decl. ¶ 22.) Mr. Szymanski stayed on the wing for only a minute or two before he reported to Captain Kamola that he had not seen any lights. (Id.) The Kariba steadied on a course of 300º for only about 15 to 20 seconds before Captain Kamola ordered another turn this time of 20º to starboard. Seconds later he sighted the lights of the Tricolor only a short distance away. He ordered the helmsman to put the rudder hard to starboard to avoid collision and yelled, "Oh my God, we will hit them." (Szymanski Decl. ¶ 24.) Unfortunately, the hard rudder turn was too late and the Kariba hit the Tricolor on its port beam. This all happened within the span of a few minutes.

The proof at trial showed that Captain Kamola misread his ARPA and believed that the Clary was closer than it was. This is apparent from Kamola's conflicting statements before trial and his short narrative written just after the collision. Directly following the collision he wrote that the Clary was only about one mile away when he began the starboard turn. (Ex. 135; Ex. 204; Ex. 205.) The Clary was in fact approximately 2.6 miles away at that point. (Torborg Decl. at 15; Boyce Simulation, Ex. 426.) This distance translates into a Time of Closest Point of Approach ("TCPA") of about eight minutes. Put another way, the Kariba would not have hit the Clary for

another eight minutes when Captain Kamola made the turn to starboard. (Boyce Simulation, Ex. 426.) Even Captain Kamola thought that he still had six or seven minutes until collision if no action was taken. (Kamola Decl. ¶ 37; Tr. 96:05-07.) Neither Captain Kamola nor Second Officer Szymanski had read the instruction manual for the new 3 cm radar that had been installed that day on the Kariba. (Tr. 552:22-25; 554:11-13; 570:24 – 571:01-07.) This failure, coupled with his conflicting stories, lead me to doubt Captain Kamola's credibility.

He went on to testify and deny that he tried to cross Tricolor's bow as Clary suggests, but at a previous deposition, he admitted that it was his intention to go ahead of the vessel on his starboard quarter. (Tr. 106:25 – 108:11.) The Tricolor turned earlier than the Kariba to round the Fairy South buoy so the gap between the two ships was decreased. (Sofrelog Ex. 428-A.) Captain Kamola was clearly preoccupied with the position of the Clary and failed to appreciate the location of the Tricolor, and apparently from the proof before me, believed that Tricolor was a greater distance behind him rather than almost parallel.

At trial, with the benefit of hindsight, Captain Kamola testified that he could have slowed down and would have avoided collision but ruled out doing so because he was afraid it would create another collision when and if Clary made the turn to starboard astern of the Kariba. (Tr. 104:3-17.) The proof, however, demonstrates that the Kariba, had it simply maintained its course at 290° and speed at 16.0 knots, would have found the Clary made its turn with time to pass safely behind both the Kariba and the Tricolor. (Ex. 1017 ¶ 2.)

### B. The Situation on the Tricolor

The Tricolor was a roll-on, roll-off type car carrier built in 1987, with an overall length of 190.0 meters. On the night of the collision, the Tricolor commenced a voyage from Zeebrugge, Belgium to Southampton, England, with a cargo of some 3000 motorized vehicles bound for ports in the United States. The Tricolor's Master was John Knutsen and the Second Officer, Arnel Cabanda. Both were on the bridge that night.

Kariba argues that the Tricolor was passing too close and that if there was a safe distance between the two vessels, Tricolor could have seen Kariba's maneuver to starboard and made a similar adjustment with time to spare. Kariba was steering a course of approximately 290° before she started to turn to starboard and into the Tricolor. Tricolor was steering a course between 290° and 292°. (Knutsen Decl. ¶35.) The proof shows that half a mile between ships is an acceptable distance in the West Hinder TSS for ships to pass one another. (Ex. 2042; Torborg Report at 35.) The lane itself is only a little over two miles wide. (Sofrelog Ex. 428-A.) Kariba also argues that Tricolor should have seen the Kariba's turn to starboard and made the same starboard turn to keep distance between the two ships. But it is apparent that as soon as Captain Knutsen was able to detect the Kariba's turn, he switched Tricolor's steering from autopilot to manual steering and ordered the rudder hard right. (Knutsen Dec. ¶43.) If the steering were already in manual Captain Knutsen would have only saved a few seconds, not enough time to avert the collision. (Tr. 425:13 – 4:26:01.)

Kariba also argues that Tricolor was traveling too fast, but Kariba and Tricolor were traveling approximately 16.0 and 17.9 knots respectively. (Ex. 426; Sofrelog Ex. 428-A.) If both vessels had maintained course and speed, Tricolor would have overtaken Kariba at a fairly low relative speed of 1.9 knots. (Tr. 861:9-11.)

Kariba makes several other allegations but none of them hold water. First, Tricolor did not, as Kariba suggests, turn to port in the moments leading up to the collision. This assertion relies on the Sofrelog video from the Dunkerque radar where the mark representing the Tricolor appears to shift to port but in fact this was what is called a "target swap" and it occurs, as it did here, when the Kariba got close enough to the Tricolor so that the radar processor confused the two vessels. (Torborg Decl. at 9.) The result was the appearance of a course change that even Kariba's expert discredited. (Tr. 651:4-14.)

Second, Captain Knutsen was on the bridge in the minutes leading up to the collision and there was no evidence to support the notion that he was in his cabin at that time, as Kariba attempts to suggest. The proof seems fairly clear that it was merely a

coincidence that Captain Knutsen ended up in the lifejacket marked "Captain," which as a rule is stored in the captain's cabin. (Ex. 1011A-B, Tr. 325:18-24.)

Finally, while Kariba contends that the Tricolor's masthead light was off at the time of the collision, the testimony of Captain Kamola indicates that he saw the light just before the ships hit. (Tr. 171:10-23.)

### C. The Situation on the Clary

The Clary is a bulk carrier registered under the flag of Singapore. It was built in 1979, with an overall length of 138.35 meters. It was on a voyage from Savannah, Georgia with cargo bound for the Netherlands. In the minutes leading up to the collision, Clary was heading North at approximately 13 knots over ground. (Toncic Decl. ¶ 10.) The only person on the bridge was Second Officer Toncic who was also the navigational officer and had the midnight to 4:00 a.m. watch. (Id.) The Captain was below in his cabin sleeping, there was no lookout or helmsman. (Tr. 434:18-25.) This one-man-band operation meant that Second Officer Toncic could not maintain a continuous radar watch of the other vessels in the area and make any course changes. (Id.) Also, the radar on the Clary did not have a full ARPA system, so Toncic had to manually pick out targets with which there was a chance of collision. (Tr. 436:11-25.)

At least 10 minutes before his maneuver to starboard, Toncic observed Kariba, Tricolor, and several other vessels traveling in the Westbound TSS on his radar. (Toncic Decl. ¶¶ 11-14.) At approximately 2:11:15 a.m., when the Clary was about two miles south of the Hinder 1 buoy, and approximately three miles (or eight minutes) away from collision with the Kariba, Toncic decided it was time to make the turn to starboard. He moved away from his radar, plotted his position on the chart table, then changed from automatic steering to manual and turned to starboard on a course from 25.6º to 73.6º. This was the change of course all the vessels expected Clary to make and took place in under two minutes. Toncic testified that he thought it necessary to make a bold turn to starboard in order to safely maneuver around the stern of both the Kariba and Tricolor. (Id. ¶¶ 14-16.) He also thought that a dramatic turn was necessary to register on the radar

of the other vessels and that the Kariba and Tricolor would simply maintain course and speed.  (Id. ¶ 15.)

About two minutes later, after Toncic made the turn, he heard some sort of "collision" cry on the VHF radio.  (Tr. 452.)  He returned to his radar and observed that the radar echos of the Kariba and the Tricolor had merged.  (Id. at ¶ 20.)  Toncic then altered course again to sail North ahead of the collided ships rather than around their sterns as he had originally intended.  (Id.)

Kariba makes much of the fact that Clary did not stay behind to help with the wreck and rescue the crew of the Tricolor, but instead went on its intended course to the Netherlands.  There really is no excuse for Second Officer Toncic's failure to stay and answer the distress call.  (Tr. 451:22 – 451:25.)   He claimed that he did not understand the severity of the collision, and thought that the ships had merely "kissed."  (Tr. 469:06-17.)  Second Officer Toncic testified that he only heard "collision" twice, and that had he heard a "Mayday!" distress call he would have altered course to help with the wreck. (Id.)  He also did not believe his vessel to be the closest so as to obligate him to stop. (Id.)  While his actions after the collision may be indefensible and even reprehensible, they appear to have no bearing on our inquiry i.e., who was responsible for the collision.

Neither Clary nor Tricolor sounded fog signals, and there were no fog signals from any other vessel in the time leading up to the collision. (Tr. 251:15-18; 4:13-14, Ignacio Decl. ¶10.)  Kariba's Second Mate testified that he sounded fog signals, but this is unconvincing because Kariba's helmsman did not remember hearing any signals, nor did he remember the fog signal button being pushed, which was situated right next to him. (Tr. 237:14-23.)  Nevertheless, because of the vessels' dependence on radar, it is not likely that any fog signals would have improved or changed the situation.

At first the Court was surprised that none of the ships contacted one another via VHF radio to inquire which one was to take evasive action, but the testimony indicated that use of the VHF radio is discouraged here, it being too difficult to identify which vessel is which because of their being so many ships present in the TSS.  (Tr. 405:02-07; Ex. 371.)

9

## III. CONCLUSIONS OF LAW

The liability of Kariba, Tricolor, and Clary, if any, for the claims before this Court is to be determined in accordance with Article 4 of the Brussels Collision Convention of 1910, which provides in relevant part:

> If two or more vessels are in fault the liability of each vessel shall be in proportion to the degree of the faults respectively committed. Provided, that if, having regard to the circumstances, it is not possible to establish the degree of respective faults, or if it appears that the faults are equal, the liability shall be apportioned equally.

To apportion liability under Article 4, the Court must consider "both the relative culpability, or 'blameworthiness,' of the parties' faults and the relative 'causative effect' of each party's acts." In re Seiriki Kisen Kaisha and Dragon Navigation, S.A., 629 F. Supp. 1374, 1381 (S.D.N.Y. 1986); see also Healy & Sweeney, The Law of Marine Collision 310-312 (1998). Essentially, the Court must first identify the faults that were causative, and then assign liability based on those causative faults. United States v. Reliable Transfer, 421 U.S. 397, 411 (1975).

The parties all had the same obligations under the COLREGS regarding the avoidance of collisions. Rule 8 applies in any condition of visibility, while Rule 19 applies only to vessels navigating in restricted visibility. Craig H. Allen, Farwell's Rules of the Nautical Road, 455, 462 (8th ed. 2005). When read together Rules 8[5] and 19[6]

---

[5] Rule 8 states in pertinent part, "If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion."
[6] Rule 19 states:
> (d) A vessel which detects by radar alone the presence of another vessel shall determine if a close-quarters situation is developing and/or risk of collision exists. If so, she shall take avoiding action in ample time, provided that when such action consists of an alteration of course, so far as possible the following shall be avoided:
> > (i) an alteration of course to port for a vessel forward of the beam, other than for a vessel being overtaken;
> > (ii) an alteration of course towards a vessel abeam or abaft the beam ….
>
> (e) Except where it has been determined that a risk of collision does not exist, every vessel which hears apparently forward of her beam the fog signal of another vessel, or which cannot avoid a close-quarters situation with another vessel forward of her beam, shall reduce her speed to the minimum at which she can be kept on her course. She

require all vessels to take positive action in ample time to avoid close-quarters situations, and thus avoid collisions. They also necessitate passing at a safe distance.

### A. Kariba's Liability

Generally, Kariba argues that while its turn to starboard was the immediate cause of the collision, Clary and Tricolor should share the liability because navigational errors and numerous violations of the COLREGS were also causative. It is true that the Clary could have turned to starboard earlier than it did, and it is also true that in the process of overtaking the Kariba, the Tricolor could have given the Kariba more sea room. It may also be true that had the Clary and Tricolor done either of those things, Captain Kamola might not have made the turn to starboard, but the failure to do these things cannot be said to have caused the collision. In short, it was not the Tricolor's or Clary's failure to act that was the cause; rather, the sole and exclusive cause of the collision was the Kariba's turn to starboard. There may have been other faults which led up to this single fault, but none were causative.

Kariba violated Rule 19(e) of the COLREGS, which required Kariba, if she could not avoid a close-quarters situation with another vessel forward of her beam (the Clary), to reduce her speed to the minimum at which she could be kept on her course, "or take all her way off." Rule 19(d) also required Kariba to avoid "so far as possible … an alteration of course towards a vessel abeam or abaft the beam." The Tricolor was abaft Kariba's starboard beam when it made the starboard turn.

Kariba argues that it was relieved of its obligation to obey Rule 19 through Rule 2 because this situation presented the danger of three vessels colliding simultaneously and thus constitutes a "special circumstance." Rule 2 provides in part that "special circumstances … may make a departure from these Rules necessary to avoid immediate danger." But the presence of more than two vessels in not a per se "special circumstance." <u>Ching Sheng Fishery Co. Ltd. v. United States</u>, 124 F.3d 152, 161 (2d Cir. 1997). This rule applies to facts "where there is an immediate danger, perfectly

---

shall if necessary take all her way off and in any event navigate with extreme caution until danger of collision is over.

clear; and the departure from the rules must be no more than is necessary." Yang-Tsze Ins. Ass'n v. Furness, Withy & Co., 215 F. 859, 861-62 (2d Cir. 1914). This was not the case here. Indeed, when Captain Kamola initiated his first turn to starboard, the Clary and Kariba were still eight minutes away from collision.

Professor Craig H. Allen warns of situations just like this in his treatise, Farwell's Rules of the Nautical Road, where "a too-soon departure from the rules may be the cause of a collision." Craig H. Allen, Farwell's Rules of the Nautical Road 112 (8th ed. 2005)(hereinafter "Farwell's"). Rule 2 "instructs the mariner to guard against tunnel vision … while avoiding collision with vessel A, beware of the effect of the maneuver on vessel B or C." Farwell's at 109. Here, the action Captain Kamola took to avoid a collision with Clary, the vessel which for some unknown reason was the focus of his attentions, caused the Kariba to collide with the Tricolor.

It is important to note that after Captain Kamola made the first 10° turn, he did not even stay long enough on this course to calculate its effect on his collision course with the Clary. It defies logic that Captain Kamola then made the even more dramatic 20° turn to starboard, which put the Kariba on a very rapid collision course with the Tricolor. If there was an immanent danger of collision with the Clary, which doesn't appear to be the case, he could have simply cut his engines. Kariba argues that slowing down wasn't an option because if Captain Kamola had slowed the Kariba and the Clary made its turn, it would not obviate the risk of collision. But this argument is unavailing because Captain Kamola testified that his turns to starboard were made because he was convinced that he could wait no longer and he believed that the Clary would not take avoiding action. (Tr. 105:07.) If this is true, then slowing down was indeed the only viable option. It was, in fact, the only option condoned by Rules 8 and 19.

The rules of the road "are familiar to all masters and pilots, and each of the vessels in a crossing situation may presume that the other will comply with the rules." Ocean Marine, Ltd. v. United States Lines Co., 300 F.2d 496 (2d Cir. 1962). At trial, the testimony of every witness underscored the belief that the Clary, as the give-way ship in this crossing situation, was obligated to turn to starboard and that Kariba's duty was to

maintain course and speed. The proof belies the position as posed by the Kariba that it was "boxed in" by the Tricolor and Clary. In order to be boxed in, there must be four sides closed. One side of the box was always open because at any time the Kariba could have simply cut her motor and slowed down. Even Kariba's expert, Professor Hard, conceded that the Kariba should have slowed down pursuant to Rule 19(e). (Tr. 731:14 – 732:04.)

### B. Tricolor's Liability

Tricolor, as an overtaking vessel, had an obligation to "keep out of the way of the vessel being overtaken" pursuant to COLREG Rule 13. Rule 16 also requires that "[e]very vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear." Kariba argues that the Tricolor was too close to the Kariba when it attempted to overtake. The Kariba and Tricolor were on roughly parallel courses as Tricolor was overtaking. If Kariba had not made its starboard turn, Tricolor would have overtaken the Kariba at approximately .4 to .5 miles off Kariba's starboard side. (Tr. 294:07-11; 299:05-07; Sofrelog Ex. 428-A.) This passing distance appears to be acceptable in this TSS in the English Channel and not too close as the Kariba urges. (Ex. 2042, Torborg Report at 35.) In fact it is a wider distance than the .20 to .25 miles distance in which the Kariba passed another vessel just a little earlier in the TSS. (Tr. 769:18 – 770:23.)

Kariba contends that Tricolor had an absolute duty to keep out of Kariba's way under Rule 13, and to anticipate such course changes as Kariba might be required to make due to the actions or inactions of other vessels, including Clary. An overtaken vessel, in keeping course and speed, is free to make predictable adjustments in course and speed necessary for safe navigation. Penn Tanker v. Exxon Massachusetts, 1981 AMC 1903 (S.D.N.Y. 1981). But Tricolor was obligated to stay out of the way of predictable course adjustments and based on the proof, this was not at all the type of predictable course change that could be expected. There was no way the Tricolor could have anticipated Kariba's course change because the correct assumption was that the Clary

13

would take avoiding action, or if the Kariba were forced to maneuver it would have slowed down, and not instead make the turn to starboard. The Tricolor was permitted to presume that Kariba would obey the COLREGS and, thus would not abruptly and unpredictably turn into the Tricolor.

Kariba also argues that the Tricolor should have seen Kariba's first starboard turn of 10° and turned herself, but the proof at trial demonstrated that Kariba's first turn of 10° was too small a course change to register on the other vessels' radar. (Ex. 2042, Torborg Report at 36.) Captain Knutsen detected Kariba's turn as early as it could have been detected, and immediately switched the steering from autopilot to hand steering and ordered the rudder hard right. (Ex. 2042, Torborg Report at 21; Knutsen Dec. ¶¶ 23, 43.) I conclude that there was no fault shown on the part of Tricolor and that there was no way for the Tricolor to have avoided the collision.

### C. Clary's Liability

At the outset Clary's duties under the COLREGS were much the same as the Kariba's except as the crossing vessel, or give-way vessel, it was Clary's duty to act first and turn to starboard to go behind the Kariba and Tricolor. The Kariba's duty, as the stand-on vessel, was to maintain course and speed.

It is true that the Clary violated several of the COLREGS and was at best sloppy and at worst dishonest in its on-board log-keeping, but none of these violations appear causative of the collision. Further, Clary did not have a proper lookout, or another sailor on the bridge with Second Officer Toncic, which is a violation of Rules 2(a) and 5 and at best poor seamanship, but again it did not contribute to the accident.

Nor did the Clary, or any vessel for that matter, sound any fog signals. While this was a violation of Rule 35 of the COLREGS, I conclude it had no effect on the collision. A vessel's failure to sound fog signals is not causative when that vessel has already been located on the other vessel's radar screen. N. Healy & J. Sweeney, The Law of Marine Collision 234 (1st ed. 1998)(citing In re Hellenic Lines, Ltd., 730 F.2d 159, 162 (4th Cir.

14

1984). All the ships were monitoring the relative positions of the other ships in the TSS on radar and so the fog signals would have been of little use.

Rule 19(d) of the COLREGS provides that a vessel "which detects by radar alone the presence of another vessel shall determine if a close-quarters situation is developing and/or a risk of collision exists. If so, she shall take avoiding action in ample time …" Kariba argues that the Clary allowed a close-quarters situation to develop with the Kariba by Clary's failure to maneuver in ample time to avoid collision. There is no hard and fast rule to determine if a close-quarters or risk of collision situation exists. It is not defined in the COLREGS and the case law suggests that its existence should be determined on a case-by-case basis taking into consideration the location of the vessels and the time and space in which they have to maneuver. See e.g., In re G&G Shipping Co., 767 F. Supp. 398, 410 (D.P.R. 1991). "Since the rules are designed to prevent the risk of collision as well as collision itself, it is not necessary for a collision to be imminent or even probable before the obligation imposed by them accrues . . . [A] situation may involve risk of collision before there is actual danger, but when the relation between the vessels is such that danger may shortly arise, if the rules are not obeyed." Ocean Marine, Ltd. v. United States Lines Co., 300 F.2d 496 (2d Cir. 1962).

Not surprisingly, Kariba's and Clary's experts disagree as to when close-quarters might have come to exist in this situation. Clary's expert, Captain Hickey, opined that a close-quarters situation would not have developed until the vessels were between .7 and 1.0 miles apart, while Kariba's expert, Captain Hard stated that it was between two and three miles. (Tr. 964:15-18; Tr. 690:9-24.) Also, the case law cited by Kariba supports distances two miles or greater to constitute close-quarters in crossing situations. See Alkemeon Naviera, S.A. v. M/V "Marina L", 633F.2d 789, 795 n. 10 (9th Cir. 1980)(finding close-quarters range from two to almost five miles"); Socony Vacuum Trans. Co. v. Gypsum Packet Co., 153 F.2d 773, 775-76 (2d Cir. 1946)(holding that close-quarters existed between vessels that were two and one half to three miles apart); In re Hellenic Lines, Ltd. v. Prudential Lines, Inc., 730 F.2d 159, 164 (4th Cir. 1994) (holding that "any passing distance under two miles is close quarters in a fog"). But

these cases describe ships on the high seas where it is reasonable to expect vessels to remain further away from each other and to maneuver earlier to avoid collision, but the West Hinder TSS is a different story. This area of the Dover straits appears heavily trafficked and despite the late hour there were quite a few other vessels in the area.[7] It would be naive to assume that a vessel was obligated to maneuver when it was ten or more minutes away from collision, because to avoid one collision could serve only to put it on a collision course with another. Also it would obligate all the vessels in the area to slow to the degree that maneuvering in this portion of the channel would be impractical. Not only was Clary obligated to turn to starboard and go around the sterns of the Kariba and Tricolor, the Clary also had to stay well ahead of the bows of the two other vessels coming up behind the Kariba and Tricolor in the same traffic lane. Based on the speed of the vessels, their distance and time away from collision, it is clear that the Clary began its turn just as a close-quarters situation began to develop with the Kariba. Had Toncic waited longer to turn, he would have certainly been in a close-quarters situation. By turning when he did, he managed to avoid it.

  Kariba also argues that the Clary was in violation of Rules 8 and 19(d) which require that actions taken to avoid collisions shall be made "in ample time" so as to be "unmistakably apparent to the other vessel." Elenson v. S.S. Fortaleza, 1991 U.S. Dist. LEXIS 16853 at *14-15 (S.D.N.Y. 1991). When Clary began its turn to starboard, Clary was still about three miles away from the Kariba and roughly eight minutes from collision. Given the proximity of these vessels and the other vessels in the TSS at that time and the amount of time the vessels had before a collision would occur, the Clary did maneuver in ample time to avoid collision. Had the Kariba simply maintained course and speed, Captain Kamola would have seen the Clary's maneuver and realized that it would pass safely astern.

  There is also the allegation that Clary was proceeding at an unsafe speed, but Clary was going significantly slower than either of the other two vessels (Kariba 16.0

---

[7] On a typical day there are 124 vessels crossing the traffic lane (as was the Clary) and 131 vessels following the traffic lane (as were the Kariba and Tricolor). Farwell's at 328, n.27 (citations omitted).

knots, Tricolor 17.9 knots, and Clary 13 knots). Clary was under no obligation to slow down because it always had the option under Rule 8(c) to alter course because there were no other vessels on Clary's starboard side.

## IV. CONCLUSION AND ORDER OF JUDGMENT

Accordingly, the cause of the collision was the sole and exclusive fault of the Kariba. The Tricolor and Clary share no portion of liability for the collision. The clerk of the court is instructed to close any open motions. The parties will present the Court with a proposed schedule to address the damages claims on or before January 15, 2006.

**SO ORDERED.**
New York, New York
January ___, 2006

_____
U.S.D.J.