**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x

| | |
|---|---|
| **OTAL INVESTMENTS LIMITED, as Owner of the** : | |
| **M/V KARIBA, for Exoneration from or Limitation** : | |
| **of Liability,** : | |
| : | **03 Civ. 4304 (HB)** |
| **Plaintiff / Third-Party Plaintiff,** : | |
| : | <u>AMENDED OPINION &</u> |
| **UNITED SERVICES AUTOMOBILE** : | <u>ORDER</u> |
| **ASSOCIATION, ASI AUTO SHIPMENT GMBH,** : | **Consolidated cases:** |
| **TED L. RAUSCH CO., CHARLES BROOMFIELD,** : | **03 Civ. 9962** |
| **MORGAN MOON, PATRICIA YORK, AUGUSTA** : | **04 Civ. 1107** |
| **ASSICURAZIONI S.P.A., CHN ITALIA S.P.A., CNH** : | |
| **TRADE N.V., NEW HOLLAND NORTH, INC.,** : | |
| **FEDEX TRADE NETWORKS TRANSPORT AND** : | |
| **BROKERAGE, INC., O & K ORENSTEIN &** : | |
| **KOPPEL A.G., CASE CORPORATION AND** : | |
| **TOWER GROUP INTERNATIONAL, ZURICH** : | |
| **INSURANCE CO., ALPINA INSURANCE CO.,** : | |
| **GERLING INSURANCE CO., as subrogee and/or** : | |
| **assignee of SCHEMPP-HIRTH FLUGZEUG-** : | |
| **VERTRIEBS-GMBH, DAVID GREEN HILL,** : | |
| **LIEBHERR-WERK NENZIG GMBH,** : | |
| **LIEBHERR-MISCHTEKNIK, LCT LIEBHERR** : | |
| **CONCRETE TECHNOLOGIE, LIEBHERR** : | |
| **AMERICA, INC., E.H. HARMS GMBH & CO., BMW** : | |
| **OF NORTH AMERICA LLC, N.V. FORTIS** : | |
| **CORPORATE INSURANCE,** : | |
| : | |
| **Claimants,** : | |
| : | |
| **-against-** : | |
| : | |
| **M/V CLARY, MINERAL SHIPPING CO. PRIVATE** : | |
| **LTD., MST MINERALIEN SCHIFFAHRT** : | |
| **SPEDITION UND TRANSPORT, CLARY SHIPPING** : | |
| **PTE LTD., WALLENIUS WILHEMSEN LINES AS,** : | |
| **WILH. WILHEMSEN ASA, ACTINOR CAR** : | |
| **CARRIER I AS, CAPITAL BANK PUBLIC LIMITED** : | |
| **COMPANY, AND M/V TRICOLOR,** : | |
| : | |
| **Third-Party Defendants /** : | |
| **Consolidated Defendants.** : | |

------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

During the minutes after 2 a.m. on December 14, 2002, three ships sailing in the English channel—the Kariba, the Tricolor and the Clary—committed navigational errors that caused the Kariba and the Tricolor to collide and the Tricolor to capsize and sink.[1]  On January 4, 2006, after a bench trial, this Court found the Kariba 100% liable for the collision.  The Kariba's owner and various owners of lost cargo appealed, and on July 6, 2007, the Second Circuit held that all three vessels were liable for the collision and remanded the matter to this Court to allocate percentages of liability among them.  For the reasons set forth below, and with guidance from the Court of Appeals, this Court now finds that the Kariba was 63% liable for the collision, the Clary 20% liable and the Tricolor 17% liable.

Other issues on remand are whether the Tricolor's speed was a proximate cause of the collision, whether the liability of the Tricolor and the Clary may be limited pursuant to the Limitation of Vessel Owner's Liability Act (the "Limitation of Liability Act"), 46 U.S.C. App. § 183 *et seq.*, replaced by 46 U.S.C. § 30505, *et seq.*, and whether the Tricolor is subject to limitation or exoneration under the United States Carriage of Goods by Sea Act ("COGSA"), Ch. 229, 49 Stat. 1207 (1936), Pub. L. No. 109-304, 120 Stat. 1485 (2006), reprinted in note following 46 U.S.C. § 30701 (formerly codified at 46 U.S.C. § 1300, *et seq.*).  For the reasons set forth below, this Court holds that the Tricolor's speed was a proximate cause of the collision. Further, the Clary may not limit its liability pursuant to the Limitation of Liability Act.  The owner of the Tricolor, however, may limit its liability pursuant to the Limitation of Liability Act, and is exonerated from liability under COGSA.

## I. FACTUAL BACKGROUND[2]

While many of the facts are set out in my earlier opinion, they are restated here with more clarity and, where helpful to do so, in concert with the language in the Circuit's opinion.  At 1:55 a.m. on December 14, 2002, during a night of thick fog and low visibility, the Kariba, the Tricolor and the Clary were sailing in the international waters of the English Channel off the

---

[1] The parties to this action are Otal Investments Ltd., the owner of the M/V Kariba (the "Kariba"); Capital Bank Public Limited Company, Actinor Car Carrier I AS, Wilh. Wilhelmsen ASA and Wallenius Wilhelmsen Lines AS, the owners and other companies affiliated with the M/V Tricolor (collectively, the "Tricolor"); Clary Shipping Pte. Ltd., MST Mineralien Schiffahrt Spedition and Transport GmbH, Mineral Shipping Co. Private Ltd., the owners and other companies affiliated with the M/V Clary (collectively, the "Clary"); and the owners, insurers and other companies affiliated with the damaged cargo (collectively, the "Cargo Claimants").

[2] Familiarity with the Court's initial Opinion and the decision of the Second Circuit is assumed, and therefore the Court will reiterate only those facts most pertinent to the issues on remand.

coast of Dunkerque, France, and were approaching an intersection in a Traffic Separation Scheme ("TSS"). The Kariba and the Tricolor were proceeding westward on the East-West branch of the TSS, with the Kariba ahead and the Tricolor some distance behind and about one-half mile to the north of the Kariba. Because the Kariba was sailing at about 16 knots and the Tricolor at 17.9 knots, the Tricolor was gradually overtaking the Kariba and, had the ships maintained their courses, the Tricolor would have passed the Kariba on its starboard side with about one-half mile between them. The Clary, meanwhile, was moving northward on the North-South branch of the TSS at 13 knots, on a collision course with the Kariba.

A.     **The Men on the Bridges of the Three Vessels**

On the Kariba, three men were on the bridge: Captain Kamola, who was making his first restricted-visibility voyage as a Master, Second Officer Szymanski and Able-Bodied Seaman Ignacio. They had access to the Kariba's Automatic Radar Plotting Aid ("ARPA"), a computer system that "automatically tracks and plots target vessels and calculates their courses and speeds," thus predicting the "closest point of approach" of other vessels. *In re Otal Invs. Ltd.*, 494 F.3d 40, 47 (2d Cir. 2007) ("*Otal II*"). The Tricolor also had an ARPA system and three seamen on its bridge: Captain Knutsen, Second Officer Cabanda and Able-Bodied Seaman Matel. The Clary's bridge was manned by just one person: Second Officer Toncic. Due in part to its smaller size, the Clary was not equipped with an ARPA system but did have a device that could calculate the whereabouts of other vessels. That device, however, did not do so automatically as an ARPA would, but could make calculations only for those vessels selected by the one man on the bridge, Second Officer Toncic.

B.     **From 1:55 a.m. to 2:02 a.m.**

On the Kariba, Captain Kamola first noticed the Clary on his radar at 1:55 a.m. At 2:00 a.m., after rounding the Fairy South Buoy, he realized that he might be headed for a collision with the Clary. *Id.* at 47-48. Captain Kamola did nothing at this time, however, because he expected the Clary to turn to starboard and pass astern of the Kariba and the Tricolor in accordance with basic navigational rules. *In re Otal Invs. Ltd.*, No. 03 Civ. 4304, 2006 WL 14512, at *2 (S.D.N.Y. Jan. 4, 2006) ("*Otal I*") ("There is no dispute that it was the duty of the Clary, as the vessel intersecting the West-bound TSS, to turn to starboard and go safely astern of the Kariba and Tricolor."). On the Clary, by 2:00 a.m., Second Officer Toncic noticed the Kariba and the Tricolor on his radar. By 2:02 a.m., had Toncic plotted the course of the Kariba

he would have realized that only 3.1 miles separated the Clary from a collision with the Kariba. Toncic took no action and maintained his northward course.

## C.  From 2:04 a.m. to 2:06 a.m.

Meanwhile, on the Tricolor, Captain Knutsen knew that the Kariba was ahead of him, and by 2:04:38 a.m. he realized that the Clary and the Kariba were on a collision course with each other.  Tr. of Oral Argument 48:2 (Feb. 13, 2008) (citing Trial Tr. 255-257).  Captain Knutsen, however, did nothing and maintained the Tricolor's course and speed.  On the Kariba, at 2:04 a.m., when the Kariba was approximately eight minutes away from a collision with the Clary—and the Kariba's ARPA would have shown so—Captain Kamola asked his second officer to go into the port wing and check for the Clary's lights.  Second Officer Szymanski looked for approximately two minutes, but did not see anything.  Now, at 2:06 a.m., the Kariba was approximately six minutes, or 2.8 miles away from a collision with the Clary.[3]  Captain Kamola did nothing still.

## D.  From 2:09 am. to 2:13 a.m.

By 2:09 a.m., on the Kariba, Captain Kamola's ARPA showed that the Clary had not changed its course to steer astern of the Kariba and the Tricolor, as was undisputedly required by navigational rules.  At 2:09:45 a.m., only about two miles away from a collision with the Clary, Captain Kamola ordered the Kariba to turn ten degrees to starboard.  Fifteen to twenty seconds later, or sometime between 2:10:00 and 2:10:05 a.m., Captain Kamola ordered an additional twenty-degree turn to starboard.  At about 2:12 a.m., Captain Knutsen on the Tricolor saw that the Kariba had abruptly turned to starboard and was heading straight for him.  Seeking to avoid a collision, Captain Knutsen and Second Officer Cabanda simultaneously converged on the Tricolor's wheel, hurriedly disengaged the autopilot and sent the Tricolor hard to starboard to evade the Kariba.  Meanwhile, Captain Kamola on the Kariba saw the lights of the Tricolor and ordered the rudder full to starboard to try to avoid a collision.  It was too late, however, as within

---

[3] As noted by the Second Circuit in *Otal II*, "[t]hese distances are taken from a computer simulation of the collision based on data collected by radar in Dunkerque, France.  A compact disk ('CD'), showing the positions and movements of the three ships, was presented at trial by the Clary's expert, Captain Boyce, and is agreed by all parties to closely reflect the occurrences of the night in question.  The CD permits plotting alternative courses and speeds and reveals the consequences of various combinations of actions." 494 F.3d at 48 n. 3.  This CD simulation was used by the parties during the oral argument following the Circuit's remand.

the next minute or so, around 2:13 a.m., the Kariba's bow struck the Tricolor broadside, causing the Tricolor to capsize and sink. There were no human casualties.

On the Clary, Second Officer Toncic waited until 2:11:15 a.m. to make a "dramatic" turn to starboard with the intent finally to steer astern the Kariba and the Tricolor. This was approximately nine minutes after he would have known that he was on a collision course with the Kariba, had he plotted the ships' positions. At around 2:13 a.m. Toncic heard "collision, collision" on his VHF radio. Realizing that the blips on his radar that represented the Kariba and the Tricolor had coalesced and ceased to move, Toncic reverted to his original northward course to sail past and to the west of the collided ships. He did not answer the distress call. After passing the area of collision, Toncic erased his chart. At trial, he admitted that "someone" had altered Clary's logbook pages to reflect that conditions were clear and that there were two other men on deck at the time of the collision, while in point of fact Toncic was alone.

## II. PROCEDURAL POSTURE

In June 2003, Otal Investments Ltd., the owner of the Kariba, filed a complaint for exoneration or limitation of liability with respect to claims against it that arose from the collision between the Kariba and the Tricolor. In response to this complaint, numerous claimants filed claims against the Kariba, seeking damages for the loss of their cargo, which had sunk along with the Tricolor (hereinafter, the "Cargo Claimants"). The Kariba impleaded the Clary and the Tricolor as third-party defendants.

A trial to determine and apportion liability was held in October 2005, and after post-trial briefs were submitted this Court heard closing arguments on December 12, 2005. On January 4, 2006, this Court issued an Amended Opinion and Order that found the Kariba solely liable for the collision. *Otal I*, 2006 WL 14512, at *11. The Kariba and the Cargo Claimants appealed the decision, and on July 6, 2007, the Second Circuit found that the Kariba, the Tricolor and the Clary each violated the International Regulations for Preventing Collisions at Sea (the "COLREGS"), Oct. 20, 1972, 28 U.S.T. 3459, codified by Congress at 33 U.S.C. § 1602, *et seq.*, and found that each vessel committed at least one violation that was causative of the collision.

The Circuit remanded the matter to this Court (1) to decide whether the Tricolor's speed was a proximate cause of the collision, (2) to determine each vessel's relative culpability, (3) to determine the relative extent to which each vessel caused the collision, and (4) to allocate liability among the three vessels based on their relative culpability and relative causative role. In

their briefs on remand, the Tricolor and the Clary assert that their liability to the Cargo Claimants should be limited pursuant to the Limitation of Liability Act. Further, the Tricolor argues that its liability must be limited pursuant to COGSA. The Kariba and the Cargo Claimants settled their disputes with one another before trial in *Otal I*.

### III. STANDARD OF REVIEW

In allocating the liability for damages among the three vessels,

> on remand the district court will have to consider the relative culpability of each vessel and the relative extent to which the culpability of each caused the collision. In making the culpability comparison, the district court should include in its consideration of the fault of the Clary the fact that its logbook was altered.

*Otal II*, 494 F.3d at 63. "Culpability" refers to "how extensively each ship departed from a proper standard of care," *i.e.*, here, the standard of care as set forth in the COLREGS. *Id.* at 62. "Causation" refers to "the extent to which each ship's culpable conduct contributed to causing the collision." *Id.* This Court, therefore, must make two assessments: (1) the extent of each vessel's departure from the COLREGS and (2) the extent to which each departure caused the collision.

### IV. DISCUSSION

#### A.    The Tricolor

##### 1.        *Culpability: COLREG Violations*

On the Tricolor's culpability, the Second Circuit held that, as a matter of law, the Tricolor violated COLREGS 13 and 16 on overtaking and COLREGS 6 and 19(b) on safe speed. On overtaking, COLREG 13 provides that "any vessel overtaking any other shall keep out of the way of the vessel being overtaken," and COLREG 16 requires that "[e]very vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear." The Circuit held that under COLREGS 13 and 16, the overtaking vessel also has a duty to keep far enough away to allow the overtaken vessel to conduct "reasonably predictable adjustments," and that the overtaking vessel must select a safe place to overtake in the first instance, with regard to factors such as visibility, sea conditions, the space confining the vessels, the vessels' speed and their capabilities. *Otal II*, 494 F.3d at 54.

The Circuit noted that when the Tricolor's Captain Knutsen realized that he was beginning to overtake the Kariba,

> the Tricolor did not slow down but instead attempted to overtake the Kariba in a fog, at 17.9 knots, in a heavily trafficked TSS, with the knowledge the Kariba was

on a collision course with a northbound vessel, the Clary. We deem this a strikingly precarious situation: attempting to overtake without slowing or altering course in anticipation of adjustments that the overtaken vessel reasonably could be expected to make in response to a third approaching vessel.

*Id.* Therefore, the Circuit held that, in attempting to overtake under these conditions, the Tricolor violated COLREGS 13 and 16.

On safe speed, COLREG 6 requires that "[e]very vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions," and COLREG 19(b) provides that "[e]very vessel shall proceed at a safe speed adapted to the prevailing circumstances and conditions of restricted visibility." The Circuit held that, as a matter of law, the Tricolor's speed of 17.9 knots was not a safe speed "under conditions of heavy fog, in a TSS known for its traffic congestion, with the knowledge the Kariba was on a collision course with the Clary." *Id.* at 55.

## 2. *Extent to Which the Tricolor's COLREG Violations Caused the Collision*

The Circuit distinguished between factual, or but-for, causation and proximate causation, and held that both types of causation must be present to constitute a "cause" of the collision. In the context of a shipwreck, however, this Court is unable to construct a meaningful distinction between but-for and proximate causation, except that proximate causation appears, in the Circuit's view, to be tied to the types of harm that the COLREGS seek to prevent. Nonetheless, this Court has analyzed each ship's causative role with respect to both but-for and proximate causation and applies the Circuit's standard for proximate cause when determining whether the Tricolor's speed was a proximate cause of the collision, as the Circuit has instructed.

On the Tricolor's causative impact, the Circuit held that its violations of the COLREGS on overtaking were a but-for cause of the collision, finding that "[i]f the Tricolor had not chosen to overtake in an unsafe place and in an unsafe manner, the collision would not have occurred; the Kariba would have passed across the Tricolor's bow." *Id.* at 61. The Circuit found too that the Tricolor's overtaking was a proximate cause of the collision because the "choice to overtake created a risk that other vessels, particularly the Kariba, would have less space, and less time, to avoid navigational exigency leading to a collision—the very same risk as makes inopportune overtaking a violation of the COLREGS." *Id.* Therefore, the Circuit held that the Tricolor's overtaking violations were a cause of the collision.

The Circuit found that the Tricolor's speed was a factual, or a but-for, cause of the collision because "if the Tricolor had been traveling slower, the Kariba would have turned safely in front of its bow." *Id.* However, the Circuit did not decide whether the Tricolor's speed was a *proximate* cause of the collision. The Court found that, notwithstanding "the familiar" *Berry v. Sugar Notch Borough*, 191 Pa. 345 (1899), line of cases[4], the Tricolor's speed *could* have been a proximate cause, and charged this Court with answering the question in accordance with the following standard:

> This question [of whether the Tricolor's unsafe speed was a proximate cause of the collision] hinges entirely on whether the Tricolor, had it not been proceeding at an unsafe speed, would have been able to stop soon enough to avert or mitigate the harm of the collision. In other words, the question hinges not on the factor of the Tricolor's speed in isolation, but whether that speed reflected an inability to stop, or slow, in time to avoid the Kariba's abrupt abaft-the-beam turn.

*Id.*

The Circuit left unanswered the question of what would have constituted a safe speed, but suggested that "a court might usefully consult the half-distance rule for frame of reference." *Id.* at 55. Under the half-distance rule, a safe speed is "a speed permitting [the vessel] to stop within half the distance the lookout could see ahead." *Id.* (citing *Union Oil Co. v. The San Jacinto,* 409 U.S. 140 (1972)). In other words, "the vessel's speed should be sufficiently slow to enable her to stop within half the limit of visibility." *Id.* Here, Captain Knutsen stated in his trial declaration that visibility was less than a mile on the night of the collision. Knutsen Decl. ¶ 21. Accordingly, under the half-distance rule, a safe speed would have allowed the Tricolor to stop within a half-mile's distance. The Tricolor's maneuvering characteristics show that at Full Sea Speed, or 17.5 knots, the Tricolor would need about 1.02 miles to stop. Cargo Claimants' Mem. of Law on Remand Ex. B. The Tricolor was proceeding at a slightly faster speed, at 17.9 knots. Had it been proceeding at Full Ahead, or 11.2 knots, however, the Tricolor could have stopped within half a mile. *Id.* Therefore, a safe speed under the half-distance rule would have been 11.2

---

[4] The Tricolor argues extensively that its speed was not a proximate cause under the logic of *Berry v. Sugar Notch Borough*, 191 Pa. 345 (1899). Specifically, the Tricolor reasons that its speed could not have been a proximate cause because it did not increase the risk that the Kariba would make an abrupt turn to starboard. While the district court found this line of cases to have some merit, the Second Circuit explicitly charged me with determining whether the Tricolor's speed was a proximate cause, "*notwithstanding*" *Berry* and its progeny. The Circuit clearly set forth the standard for determining whether the Tricolor's speed was a proximate cause, separate and apart from whether the speed increased the likelihood that the Kariba would make its fateful turn.

knots, and the Cargo Claimants employ this line of reasoning to urge this Court that a safe speed was no faster than 11.2 knots.

The Circuit, however, observed that while stopping distance is a "major factor for considering whether a speed was safe," a court also must consider additional factors such as visibility, sea conditions, traffic and the vessels' capabilities. 494 F.3d at 55. Nevertheless, given the restricted visibility and heavy traffic that night, this Court will suppose for the moment that a safe speed would not have exceeded 11.2 knots.

Next, it must be determined whether a safe speed of 11.2 knots would have permitted the Tricolor to slow or stop in time to avoid the collision. The CD simulation prepared by Captain Boyce demonstrates that, if Captain Knutsen had decreased the Tricolor's speed to 11.2 knots once he realized that the Kariba and the Clary were on a collision course, the Kariba and the Tricolor would not have collided. Captain Knutsen testified that he became aware of the other two ships' collision course by 2:04:38 a.m. If at 2:05 a.m., he had started to decrease the Tricolor's speed from 17.9 knots to 11.2 knots, which conservatively would have required about 638.1 seconds, the simulation shows that the Kariba, after making its starboard turns, would have passed in front of the Tricolor, with no collision.[5] Therefore, had the Tricolor reduced her speed to 11.2 knots, the collision would not have occurred.

While the Tricolor does not identify a safe speed, it argues that the half-distance rule is inapplicable here because this rule is customarily used when vessels are approaching one another head-to-head, and not moving parallel to one another, as here. The Tricolor also argues that the rule is less relevant where vessels operate advanced radar equipment, as here. Tricolor's Mem. of Law on Remand 23 (Dec. 7, 2007). These arguments are moot, however. Even disregarding the half-distance rule, had the Tricolor reduced its speed to only 16 knots, the speed of the Kariba, the Boyce simulation demonstrates that the collision would not have occurred, assuming that the Kariba steadied on its course after making its abrupt turn to starboard instead of

---

[5] During oral argument, counsel for the Cargo Claimants used Captain Boyce's simulation to show that if the Tricolor had decreased its speed by 6.3 knots, from 17.5 knots to 11.2 knots, which conservatively would have required 600 seconds, the collision would not have occurred. The Tricolor, however, was traveling at a speed of 17.9 knots, not 17.5 knots. Counsel explained that the ocean current added 0.4 knots of speed. Nevertheless, this Court ran its own simulation to reduce the Tricolor's speed from a speed of 17.9 knots to 11.2 knots, or a reduction of 6.7 knots. Given the undisputed assertion that a reduction of 6.3 knots would conservatively have taken 600 seconds, a reduction of 6.7 knots would have required 638.1 seconds. Either way, the simulation shows that had the Tricolor reduced her speed to 11.2 knots, or Full Ahead, she would have avoided the collision.

stopping.  (The Kariba put on the brakes only because Captain Kamola realized it was going to ram into the Tricolor; if the Tricolor had reduced its speed to 16 knots, beginning at 2:05 a.m., there would have been no need for the Kariba to stop.)  Therefore, even if the Tricolor had reduced its speed to 16 knots to match the Kariba's speed, so that she was no longer overtaking the Kariba, she could have avoided the accident.[6]

The Tricolor devoted much of its briefs and oral argument to the proposition that it needed speed to get away from the Kariba, once the Kariba turned toward it, and *at this time* it would have been fruitless for it to slow down.  These arguments miss the point.  The question is not whether the Tricolor could have avoided the collision by slowing down once the Kariba turned toward it; clearly, then it was too late.  Rather, the question is whether the Tricolor could have avoided the collision had it been proceeding at a safe speed beginning from the moment its speed violated the COLREGS, *i.e.*, once Captain Knutsen realized the Kariba and the Clary were on a collision course, at approximately 2:05 a.m.  As demonstrated above, if at 2:05 a.m. the Tricolor had decreased its speed to match the Kariba's, the Tricolor and the Kariba would not have crashed.  If the Tricolor had decreased its speed even lower, to 11.2 knots, or Full Ahead, which may have been required under the conditions, the Tricolor and the Kariba would have kept even farther apart.

The Second Circuit observed that "proximate cause limits liability to those 'harms whose risks made the actor's conduct tortious.'"  *Otal II*, 494 F.3d at 60 (quoting Draft Restatement (Third) of Torts § 29).  The Court found "one principle particularly pertinent to this case":

> When an actor's tortious conduct is a factual cause of harm that is among the harms whose risks made the actor's conduct tortious, the actor is subject to liability for the harm even if an unforeseeable intervening act, including [a] . . . nonculpable human act, is also a factual cause of the harm.

*Id.* (quoting Draft Restatement (Third) of Torts § 33(a)).  The collision that occurred here is the type of harm that the COLREGS was put in place to prevent, and excessive speed is the kind of

_____

[6] On the Boyce simulation, this result is achieved by entering no evasive maneuver by the Tricolor and a reduction of speed by 1.9 knots (from 17.9 to 16.0 knots), beginning at 2:05 a.m. (or 300 seconds into the simulation) and requiring 181 seconds to effect the speed change, based on the undisputed ratio of 6.3 knot-decrease per 600 seconds.  Because in the simulation the Kariba stops at the time of the collision, the Kariba's speed is adjusted to remain constant at its own reduced speed of 13 knots after its turn.  The simulation then shows that the Kariba sails in front and past the Tricolor without colliding.

The Tricolor argues that the Boyce simulation cannot be relied on for precision immediately before the collision and criticizes the methods used by Captain Boyce.  This argument strikes this Court as too late, as the Second Circuit already has observed that the Boyce simulation was agreed by all parties to closely reflect the occurrences of the night in question.  494 F.3d at 48 n. 3.

dangerous behavior that the COLREGS forbids. The Tricolor's excessive speed was thus a proximate cause of the collision.

In sum, the Tricolor is culpable for two unsafe acts, unsafe overtaking and excessive speed, which together violated four COLREGS. The Tricolor's overtaking violated COLREGS 13 and 16, the Tricolor's speed violated COLREGS 6 and 19(b). Moreover, each of the Tricolor's unsafe acts was a cause of the collision and will be counted in the allocation of liability below.

## B.    The Clary

### 1.    Culpability: COLREG Violations

On the Clary's culpability, the Second Circuit held that, as a matter of law, the Clary violated COREGS 2(a) and 5 for its failure to keep a proper lookout and violated COLREG 19(d) for its failure to take avoiding action promptly. On keeping a proper look-out, COLREG 5 provides that "[e]very vessel shall at all times maintain a proper look-out by sight as well as by hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." COLREG 2(a) provides that

> [n]othing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

The Circuit affirmed this Court's findings that the Clary violated both COLREGS by staffing its bridge with a lone mariner.

On taking avoiding action, COLREG 19(d) requires that, in restricted visibility, "[a] vessel which detects by radar alone the presence of another vessel shall determine if a close-quarters situation is developing and/or risk of collision exists. If so, she shall take avoiding action in ample time . . . ." The Circuit found that, here, "the risk of collision arose when the Kariba steadied on its westward course after rounding the Fairy South Buoy," or around 2 a.m., approximately ten minutes before the Kariba made its fateful turn to starboard. 494 F.3d at 57. At this time, the Circuit held, "the Clary had a COLREG 19(d) duty to take avoiding action." *Id.* Second Officer Toncic took no avoiding action whatsoever until 2:11:15 a.m., when he made a "dramatic" turn to starboard with the intent to steer astern the Kariba and the Tricolor. At this point, however, a collision between the Kariba and the Tricolor was inevitable. The Circuit

rejected the Clary's arguments that 2:11:15 a.m. was the earliest point at which it could make a "dramatic" turn while staying within the bounds of the TSS, and the Circuit pointed out that nothing in the COLREGS mandates a "dramatic" turn, or prohibits a turn that leads a vessel to cross out of a TSS.  Moreover, the Circuit observed, the Clary could have taken avoiding action by reducing its speed but did not do so.  *Id.*

### 2.      Culpability: the Clary's Alteration of the Logbook

In its initial opinion, this Court gave no legal effect to the fact that the Clary's logbook had been altered.  Noting that "[o]ur admiralty jurisprudence is especially sensitive to the unexplained alteration of logbooks," the Circuit, however, thought that this Court should consider the alteration when assessing the Clary's relative culpability.  (The Circuit observed that "obviously" the alteration of the logbook did not "cause" the collision, however.)  The alteration consisted of the following facts, as recounted by the Circuit:

> Here, Toncic erased his chart after passing through the area of the collision.  At trial, Toncic admitted that "someone" had altered his logbook pages so as to reflect that there were three men on deck at the time of the collision—Toncic, an Able Bodied Seaman at the wheel, and a lookout—when, in fact, Toncic had been alone on the bridge at the relevant times.  In addition, Toncic's logbook reflected that conditions were clear, when conditions in fact had been—at least for part of his shift—foggy.

*Id.* at 58.

The Circuit held that any "presumption that the logbook contains facts adverse to the vessel responsible for the alteration need not be assessed" because the adverse facts ultimately were admitted by the Clary's officer.  *Id.* at 59.  Nevertheless, the Circuit directed that "[t]he Clary's alteration of its logbook will have some bearing on the ultimate issue of allocating liability for damages and the district court must take it under consideration."  *Id.*

### 3.      Extent to Which the Clary's COLREG Violations Caused the Collision

On the Clary's causative role, the Circuit found that the failure to keep a proper lookout and the failure to take avoiding action promptly were both but-for and proximate causes of the collision.  Had the Clary staffed its bridge adequately and taken avoiding action promptly, it "would not have persisted in its collision course, and the Kariba would not have found the need to make its fateful turn."  *Id.* at 62.  The Clary's negligent acts created a risk of harm that the COLREGS are designed to prevent.  *Id.*

In sum, the Circuit held that the Clary is culpable for two omissions, the failure to keep a

proper lookout and the failure to take avoiding action promptly, and violated three COLREGS. The Clary's failure to keep a proper lookout violated COLREGS 2(a) and 5, and its failure to take avoiding action promptly violated COLREG 19(d). Since the Circuit held that each of the Clary's omissions was a cause of the collision, each will be counted in the allocation of liability.

The Clary spends the bulk of its papers arguing that the Second Circuit got it wrong. Specifically, the Clary argues that the Second Circuit relied on facts that are not supported by the record, that the Circuit mistakenly interpreted the Clary's obligation under COLREG 10 and the Circuit incorrectly condoned a series of shallow turns in violation of COLREG 8. However, "[u]nder the doctrine of law of the case, a district court generally may not deviate from a mandate issued by an appellate court." *In re Ivan F. Boesky Sec. Litig.*, 957 F.2d 65, 69 (2d Cir. 1992).

## C. The Kariba

### 1. Culpability: COLREG Violations

On the Kariba's culpability, the Second Circuit affirmed this Court's conclusion that the Kariba violated COLREGS 19(e) and (d)(ii) on avoiding collisions and abaft-the-beam turns. COLREG 19(e) requires that, where a risk of collision exists in restricted visibility, a vessel

> which cannot avoid a close-quarters situation with another vessel forward of her beam shall reduce her speed to be the minimum at which she can be kept on her course. She shall if necessary take all her way off and in any event navigate with extreme caution until danger of collision is over.

The Circuit affirmed this Court's conclusion that the Kariba was thus obligated to slow down until the danger of collision had passed, instead of turning abruptly to starboard. 494 F.3d at 52-53. COLREG 19(d)(ii) provides that, in restricted visibility, if a risk of collision exists, a vessel must avoid the collision, taking care "so far as possible" to avoid "[a]n alteration of course toward a vessel abeam or abaft the beam." That is, of course, exactly what the Kariba did when it steered directly into the Tricolor, a vessel abaft its beam.

### 2. Extent to Which the Kariba's COLREG Violations Caused the Collision

On the Kariba's causative impact, the Circuit affirmed this Court's conclusion that the Kariba's abrupt abaft-the-beam turn was a but-for cause of the collision because otherwise "the vessels would have continued on roughly parallel westward courses." *Id.* at 60. The Kariba's turn proximately caused the collision because it "caused a risk that the Kariba might collide with other vessels in close proximity—the same risk of harm as makes abaft-the-beam turns illegal

under the COLREGS." *Id.* at 61.

In sum, the Kariba is culpable for having failed to navigation with extreme caution and failed to reduce its speed, in violation of COLREG 19(e), and for making its abaft-the-beam turn, in violation of COLREGS 19(d)(ii). The Kariba's turn was a cause of the collision and will be considered in the allocation of liability below.

**D.     Allocation of Liability**

Judge Sweet has observed that in this Circuit the district court has considerable discretion in determining the relative degrees of each party's fault. *Elenson v. SS Fortaleza*, No. 90 Civ. 437, 1991 WL 254571, at *11 (S.D.N.Y. Nov. 21, 1991) (citing *Getty Oil Co. (E. Ops.) v. SS Ponce de Leon*, 555 F.2d 328, 335 (2d Cir. 1977)). In the case at bar, the Second Circuit held that because an allocation of liability is "not readily amenable to precise analysis," this Court need not "do more than provide ultimate percentages of allocation, accompanied only by sufficient explanation to provide a reviewing court with some general understanding of the basis for the decision." *Otal II*, 494 F.3d at 63 (citing *In re Seiriki Kisen Kaisha*, 629 F. Supp. 1374, 1382 (S.D.N.Y. 1986)).

In reaching its allocation, this Court must follow the "two-component analysis" performed by Judge Sand in *Seiriki Kisen Kaisha* and commended by the Second Circuit. *Id.* Specifically, the Circuit directed this Court to consider, separately, the vessels' relative culpabilities and their relative causative impacts. Unfortunately, the Circuit provided no guidance as to how these relative amounts are to be computed, or whether culpability and causation should be afforded equal weight or one more than the other. The Circuit's concept is best realized and the rule best understood if we compare the vessels' culpability to arrive at culpability percentages, then separately compare their causative roles to arrive at causation percentages, and finally average each vessel's culpability and causation percentages to arrive at each ship's total percentage of liability.

### *1.     Relative Culpability Levels*

Relative culpability refers to "how extensively each ship departed from a proper standard of care." *Id.* at 62. Such an inquiry must take into account the number and seriousness of each ship's COLREG violations. *See, e.g.*, *Elenson*, 1991 WL 254571, at *11 (reviewing number and seriousness of two vessels' COLREG violations to determine which one was more culpable). Here, each ship made two acts or omissions that violated the COLREGS: the Tricolor overtook

the Kariba unsafely and proceeded at an unsafe speed, the Clary failed to keep a proper lookout and failed to take avoiding action promptly, and the Kariba made an abaft-the-beam turn instead of reducing its speed and failed to navigate with extreme caution in a close-quarters situation. Since each ship is culpable for the same number of acts or omissions, one might regard the ships as equally culpable, with 33-1/3% culpability per ship. Such an approach, however, would not take into account the seriousness of each vessel's COLREG violations or the alteration of the Clary's logbook, which the Circuit directed should be factored into this Court's assessment of relative culpability.

Assessing the relative seriousness of different COLREG violations is hardly straightforward. It would be an easier matter if, for example, each ship's only COLREG violation were speeding; then, the Court would simply find most culpable the ship that sailed the swiftest. Here, however, no two ships made the same culpable act or omission. More importantly, there is no authority that provides even a hint of a ranking that would assist this Court in determining which violations should yield greater or lesser culpability among the COLREGS at issue here: unsafe overtaking, speeding, making an abaft-the-beam turn, failing to take avoiding action promptly, failing to keep a proper lookout and failing to navigate with extreme caution. Moreover, even if such a ranking existed, it would not likely consider all the relevant circumstances, such as the extent of the departure from the standard of care or the factors contributing to the negligent act. As an illustration, for example, speeding because the captain was drunk arguably could yield greater culpability than speeding because the captain made an understandable mistake about what constituted a safe speed.

Here, the Kariba's violative acts stemmed from Captain Kamola's inexcusable decision not to read the instruction manual that came with his ARPA radar device. In fact, neither Captain Kamola nor Second Officer Szymanski had read the instruction manual for the ARPA system before they sailed on this fateful voyage. Captain Kamola, who had been on watch for seventeen hours, failed to perform any trial maneuvers on his ARPA before changing his course to starboard. *Otal I*, 2006 WL 14512, at *3. The proof at trial showed that he consequently misread his radar and believed that the Clary was closer than it was. *Id.* He also misunderstood the Tricolor's position, at least in part due to his inability to read his radar correctly and his lack of preparation. *Id.* (Captain Kamola "believed that Tricolor was a greater distance behind him rather than almost parallel."). The gravity of a captain's and his staff's incompetence with

respect to their radar system and the seriousness of their failure to perform a trial maneuver before turning toward another vessel are self-evident. *See, e.g.*, *Afran Transp. Co. v. The Bergechief*, 274 F.2d 469, 474 (2d Cir. 1960) ("affirmative duty" to use radar properly if a vessel is in or approaching an area of poor visibility). These errors, which contributed directly to the Kariba's COLREG violations, should enhance the Kariba's culpability. Therefore, this Court adjusts the Kariba's relative culpability from one-third to 40%.

The Circuit instructed this Court to consider the alteration of the Clary's logbook in assessing the Clary's culpability, and so this Court must add some percentage to the Clary's one-third, or 33-1/3% culpability. The Kariba urges an addition of 10% for the logbook alteration, but this strikes the Court as excessive. As noted *supra* the Clary failed to keep a proper lookout and failed to take avoiding action promptly, with each of these omissions counting for half of its current culpability allocation, or roughly 16.7% culpability per omission. The logbook alteration, while important, was far less vital than either the Clary's failure to keep a proper lookout or its failure to take avoiding action promptly. The Circuit held that since the Clary's officer admitted to the logbook alteration and was forthcoming during trial about the conditions on the fateful night, the alteration does not give rise to a presumption that the logbook contained adverse facts. Moreover, the logbook alteration did not create the risks of harm produced by the vessels' multiple COLREG violations. Therefore, this Court adds only a few percentage points to the Clary's one-third culpability to assign 36% culpability to the Clary.

The Tricolor is left with a relative culpability of 24%. Even though the Tricolor committed two acts (unsafe overtaking and unsafe speed), which together violated four COLREGS, the Tricolor's culpability should be lower than one-third of the ships' total culpability because the Tricolor's overtaking and speed were inextricably interrelated. Had the Tricolor not been speeding, it would not have been overtaking the Kariba. As shown *supra*, had the Tricolor not been overtaking, but rather traveling at the same speed of the Kariba, the Tricolor's speed would not have been a proximate cause of the collision. In other words, to cure its COLREG violations, the Tricolor needed only change one thing: its speed. On the other hand, the Kariba would have needed to slow down *and* not turn right, and the Clary would have had to steer astern the Kariba much sooner *and* staffed more than one man on its bridge. Finally, no additional facts militate in favor of additional culpability for the Tricolor. The Tricolor's relative culpability of 24%, therefore, is justifiably lower than the other two vessels.

In sum, the relative culpability of the three ships is as follows: Kariba – 40%; Clary – 36%; Tricolor – 24%.

### 2. *Relative Causative Impacts*

Relative causation refers to "the extent to which each ship's culpable conduct contributed to causing the collision." *Otal II*, 494 F.3d at 62. In its first opinion, this Court considered "both the relative culpability, or 'blameworthiness,' of the parties' faults and the relative 'causative effect' of each party's acts." *Otal I*, 2006 WL 14512, at *6 (quoting *Seiriki Kisen Kaisha*, 629 F. Supp. at 1381). However, this Court "assign[ed] liability based on those causative faults" only and not based on culpability. *Id.* This Court thus originally determined that because "the sole and exclusive cause of the collision was the Kariba's turn to starboard," the Kariba was 100% liable. *Id.*, at *7. As explained above, the Circuit has held that the acts and omissions of the other two ships were also causes of the collision, and this Court has now determined that the Tricolor's speed was also a cause. Nevertheless, after reviewing the facts anew under the standard provided by the Circuit, this Court remains convinced that the Kariba played by far the most causative role.

The Kariba's abrupt turn was clearly the most direct cause of the collision: the Kariba turned right into the Tricolor and sunk it. Refraining from turning would have guaranteed that the Kariba and the Tricolor would not crash. The COLREGS violated by the Kariba, on navigating with extreme caution, slowing down in close-quarters situations and avoiding abaft-the-beam turns are all aimed at preventing the sort of panicked and perilous maneuver made by Captain Kamola.

The Kariba's culpable acts caused the collision to a far greater extent than did the Tricolor's and the Clary's. The Tricolor, however, had a slightly greater causative impact than the Clary. The Tricolor's unsafe speed and overtaking put it in such close proximity with the Kariba that the collision was certain to occur once the Kariba made its abrupt turn. The Clary, for its part, might have taken avoiding action sooner had it kept a proper lookout, and the Kariba's ill-fated turn was a reaction to the Clary's failure to take avoiding action for many minutes. Nevertheless, the Clary's omissions were less causative than the Tricolor's commissions because it was farther away, and its failures therefore had less of a direct impact. This Court finds that the vessels' relative causation is as follows: Kariba – 86%; Tricolor – 10%; Clary – 4%.

### 3. *Final Allocation of Liability*

To arrive at the ultimate allocation of liability, in the absence of any authority as to the relative weights afforded to culpability and causation, I have considered culpability and causation as equally determinative and computed the average of each vessel's culpability and causation percentages. This yields the following final allocation of liability: the Kariba was 63% liable for the collision, the Clary was 20% liable, and the Tricolor was 17%.[7]

Because such an allocation of liability is "not readily amenable to precise analysis," the Circuit directed that this Court need not "do more than provide ultimate percentages of allocation, accompanied only by sufficient explanation to provide a reviewing court with some general understanding of the basis for the decision." *Otal II*, 494 F.3d at 63 (citing *Seiriki Kisen Kaisha*, 629 F. Supp. at 1382).

This result comports with the final liability allocations reached by Judge Sand in *Seiriki Kisen Kaisha*. In that case, the Stena Freighter collided with the Seiryu, causing the Seiryu to sink with substantial loss of property. Committing errors not unlike Captain Kamola's here, "[t]he Seiryu's watch officer failed to determine the risk of collision, visually by radar or otherwise, and somehow reached the entirely erroneous conclusion that the Stena Freighter was on a parallel course." 629 F. Supp. at 1379. The court found that "[o]f course, the most immediate cause of the collision was the Seiryu's turn to port, which brought her directly across the course line of the Stena Freighter. There is no way this can be explained . . . ." *Id.* Similarly, here, Captain Kamola's abrupt turn, which brought it directly across the Tricolor's course, would have been inexplicable had Captain Kamola known how to read his ARPA.

Meanwhile, the Stena, like the Clary here, failed to keep a proper lookout. *Id.* Ultimately, however, Judge Sand concluded that the greater fault lay with the Seiryu in terms of both culpability and causation due to, "most importantly, its inexplicable last minute course alteration." *Id.* at 1382. "This ultimate maneuver guaranteed that the two vessels would collide in the manner they did with the attendant consequences." *Id.* Judge Sand thus determined that a fair allocation of responsibility for the collision was 60% attributable to the Seiryu and 40% to the Stena. *Id.* Here, this Court has allocated 63% of the liability to the Kariba, 20% to the Clary

---

[7] The Kariba's relative culpability is 40% and relative causative impact 86%, which yields an average of 63%. The Tricolor's relative culpability is 24% and relative causative impact is 10%, yielding an average of 17%. The Clary's relative culpability is 36% and relative causative impact is 4%, yielding an average of 20%.

and 17% to the Tricolor.

**E.     The Limitation of Liability**

The Tricolor and the Clary repeat the arguments that they made at trial that their liability should be limited pursuant to the Limitation of Liability Act.  Because this Court found after trial that neither the Tricolor nor the Clary was liable for the collision, it did not address these parties' Limitation of Liability Act claims.  Therefore, this Court reaches the question for the first time here.

The Limitation of Liability Act allows a vessel owner to limit liability for, *inter alia*, "any loss, damage, or injury by collision . . . done, occasioned, or incurred without the privity or knowledge of the owner," to "the value of the vessel and pending freight."  46 U.S.C. § 30505(a), (b).[8]  The interest is to be valued as of the end of the voyage on which the loss or damage occurred.  *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir. 1999).

As the Second Circuit recently explained,

> [t]he statute therefore alters the normal rules of vicarious liability.  Instead of being vicariously liable for the full extent of any injuries caused by the negligence of the captain or crew employed to operate the ship, the owner's liability is limited to the value of the ship unless the owner himself had "privity or knowledge" of the negligent acts. . . . Where the owner of a ship is a corporation, the corporation is not entitled to limit its liability "where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred. . . .

*In re City of New York*, No. 07-1251, 2008 WL 817945, at *4 (2d Cir. Mar. 27, 2008) (citations omitted).

The vessel owner bears the burden of proving that it lacked privity or knowledge of the negligent acts.  *See, e.g.*, *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir. 1978), *cert. denied*, 440 U.S. 959 (1979) ("It is the owner's duty to use due and proper care to

---

[8] The Cargo Claimants accurately observe that only the owners and bareboat charterers of the Tricolor and the Clary may avail themselves of the Limitation of Liability Act.  Cargo Claimants' Mem. of Law on Remand 12.  Managers or other companies who do not actually own the vessel may not limit their liability under the Act.  *See Brown v. Teresa Marie IV, Inc.*, 477 F. Supp. 2d 266, 271 (D. Me. 2007).  Therefore, MST Mineralien Schiffahrt Spedition and Transport GmbH and Mineral Shipping Co. Private Ltd., which are associated with the Clary but are not owners or bareboat charterers, and Wallenius Wilhelmsen Lines AS, Wilh. Wilhelmsen ASA and Actinor Car Carrier I AS, which are associated with the Tricolor but are not owners or bareboat charterers, may not limit their liability.  Thus Capital Bank Public Limited Company and Clary Shipping Pte. Ltd. are the only parties associated with the Tricolor or the Clary that may be entitled to limit their liability pursuant to the Limitation of Liability Act.

provide a competent master and crew and to see that the ship is seaworthy; any loss occurring by reason of fault or neglect in these particulars is within his privity."). "Privity and knowledge 'have been construed to mean that a shipowner knew or should have known that a certain condition existed.'" *In re Sea Wolf Marine Towing & Transp., Inc.*, No. 03 Civ. 5578, 2007 WL 3340931, at *3 (S.D.N.Y. Nov. 6, 2007) (quoting *In re Potomac Transp., Inc.*, 909 F.2d 42, 46 (2d Cir. 1990) (citation and quotation marks omitted)).

Where the shipowner is a corporation, as here, privity and knowledge means privity and knowledge by a managing agent, officer, or supervising employee of a ship. *In re Hercules Carriers, Inc.*, 566 F. Supp. 962, 977 (M.D. Fla. 1983), *aff'd*, 768 F.2d 1558 (11th Cir. 1985). However, "[w]here the owner of a vessel has selected a competent captain, that captain's navigational errors or negligence are not within the knowledge or privity of the owner." *Sea Wolf*, 2007 WL 3340931, at *3 (citing *In re Kristie Leigh Enters. Inc.*, 72 F.3d 479, 481-82 (5th Cir. 1996)).

The United States Supreme Court has held that a corporate owner has a responsibility to exercise "reasonable diligence" to insure that the master operates the vessel according to instructions. *The Linseed King*, 285 U.S. 502, 512 (1932). *See also Potomac Transp.*, 909 F.2d at 46 (holding that "[t]he failure of a ship's master to exercise diligence in selecting, training, or supervising crew members whose navigational faults contribute to an accident is proper ground to deny limitation of liability," and denying limitation where the ship's master failed to observe or stand watch with third mate during third mate's first voyage as a licensed third mate); *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 504 (5th Cir. 1994) (owner was not entitled to limitation of liability where managing officer knew that the vessel was being operated in high winds); *In re Ocean Foods Boat Co.*, 692 F. Supp. 1253, 1260 (D. Or. 1988) (owner was deemed to have knowledge of negligence that led to collision because a simple inquiry would have disclosed the crew's incompetence).

In *The S.S. Hewitt,* 284 F. 911, 912 (S.D.N.Y. 1922), Judge Learned Hand held that, to achieve a limitation of liability, a shipowner need not "go [] over the possibilities, item by item." Rather, the shipowner must "undertake[] to prove that, whatever the cause of the loss, he was ignorant of it," and his proof suffices as long as he shows by a preponderance of the evidence that he took appropriate steps to ensure, and reasonably believed, that "the ship was well found, properly manned, and stanch, tight, and adequately equipped." *Id.* More recently, the First

Circuit has held that this "showing need not be made mechanically, checking off each and every conceivable cause of the loss, but, rather, permits a more global approach—one that entails an overall sifting and weighing of the relevant evidence." *Carr*, 191 F.3d at 6.

Nevertheless, "[a]ll that is needed to deny limitation is that the shipowner, 'by prior action or inaction set[s] into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of a casualty.'" *In re Oil Spill by Amoco Cadiz*, 954 F.2d 1279, 1303 (7th Cir. 1992) (quoting *Tug Ocean Prince*, 584 F.2d at 1158).

### 1.    The Clary and the Limitation of Liability Act

The Clary's owners argue that they are entitled to limit their liability pursuant to the Limitation of Liability Act because they selected a competent master and had no knowledge of any pattern of navigational errors by him. *See Kristie Leigh Enters.*, 72 F.3d at 481; *In re Nat'l Shipping Co. of Saudi Arabia*, 147 F. Supp. 2d 425, 443 (E.D. Va. 2000). Further, the evidence produced at trial shows that Second Officer Toncic was properly educated and trained and was fully qualified and competent. *See* Trial Exs. 3009 and 63-75.

However, Second Officer Toncic testified that the standard practice on the ships operated by Mineralien was for lookouts to work all day and then be put on standby for call up to the bridge if there was trouble. Trial Tr. 496-97; Cargo Claimants' Mem. of Law on Remand 17 (Dec. 7, 2007). The trial testimony established that the Clary did not always have a person on watch from 12 a.m. to 4 a.m. Rather, if the Clary needed a watch, "we know who should be called on the bridge. They were not always on the bridge." Trial Tr. 498; Cargo Claimants' Mem. of Law on Remand 17. Second Officer Toncic testified during trial that "usually there is during the night one watch, one lookout with the officer, at the open sea and this one is the AB [Able-Bodied Seaman]." Trial Tr. 500; Cargo Claimants' Mem. of Law on Remand 21. If a lookout worked at night, he would be paid overtime. The Cargo Claimants thus argue that the Clary's shoreside owners would have been aware of whether overtime was being logged and paid for lookout duty on a regular nightly basis.

The Cargo Claimants further note that instead of supervising the Clary's officers to ensure that they posted lookouts as required, the master was asleep in his room at the time of the collision. Trial Tr. 434. The Clary did not bring the master of the Clary to trial to testify in support of the request for limitation of liability.

Therefore, this Court agrees with the Cargo Claimants that the Clary's owners were in

privity with and had knowledge of the fact that the Clary at least sometimes failed to keep a proper lookout during the night. Here, the failure to keep a proper lookout was one of the Clary's COLREG violations that helped to cause the collision, and the Second Circuit found that this failure also contributed to the Clary's other negligent omission, the failure to take avoiding action promptly. Even though "the Clary's mandatory operating procedures require a lookout be posted in restricted visibility, and the company's navigation manual, [prepared by the Clary's shoreside management team] which is kept aboard ship at all times, makes this abundantly clear," Clary's Reply Brief 23 (Jan. 11, 2008) (citing Trial Ex. 60; Trial Tr. 435-36), the Cargo Claimants have shown that the Clary's owners should have known that the Clary sometimes failed to keep a proper lookout.

Moreover, as the Cargo Claimants point out, the auditor that the Clary's owners sent aboard the vessel shortly after the incident left the vessel without having learned of the collision, even though Second Officer Toncic had told the Captain and the Chief Mate about it. *See* Trial Tr. 435, 473; Cargo Claimants' Mem. of Law on Remand 22. The auditor's report concluded that the vessel had no problems in its operation. Cargo Claimants' Mem. of Law on Remand Ex. I. That the Clary's owners would not inform their auditor that the Clary had recently reacted to and then sailed around a major collision creates some doubt as to their diligence, as does the alteration of the Clary logbook.

Thus, the Clary interests may not limit their liability pursuant to the Limitation of Liability Act.

### 2. *The Tricolor and the Limitation of Liability Act*

The Tricolor argues that its COLREG violations were matters of navigation that the Tricolor's owning interests could not have known. To support this position, the Tricolor asserts that Captain Knutsen had a practice of diverting "where necessary" from the Passage Plan, which estimates in advance the speed of the voyage and "always" estimated a speed of 17.9 knots for the particular route taken by the Tricolor on the fateful night. Tricolor's Reply Brief 23 (Jan. 11, 2008). It is undisputed that Captain Knutsen made dozens, and maybe more than 100, voyages through this TSS since he became a master in 1981. Trial Tr. 331.

The Tricolor also pointed to the testimony of Captain Kenneth Arve Stokvik, the Marine Safety Superintendent who performed an internal audit of the Tricolor from November 29 to December 4, 2002, just weeks before the collision. Stokvik Trial Decl. ¶¶ 12-13, 24 (Sept. 19,

2005).  Captain Stokvik met with and interviewed the officers, reviewed the ship's logs, checked the officers' navigational skills and ability to use the equipment and had a lengthy debriefing meeting, attended by the crew, at which he discussed his findings.  While he found that the Tricolor's crew was thoroughly trained, competent and the vessel was seaworthy, his trial declaration does not discuss the Tricolor's customary speed, except to note that

> [t]he records regarding a ship's speed are automatically recorded and so are not in the deck logbook, unless certain circumstances require reduction of speed which will be noted.  If an automatic recorder is not onboard then speed is recorded in a separate maneuvering order book.  In addition, a monthly voyage report details the vessel's speed.

*Id.* ¶ 29.  Captain Stokvik concluded that "[m]y general impression of the Tricolor after the audit was that it was a very good, almost excellent, ship.  The Tricolor received an overall score of 80% which is considered very good."  *Id.* ¶ 42.

The Cargo Claimants argue that the Tricolor's owners knew, or should have known, that Captain Knutsen would sail at an unsafe speed because he testified that in creating the Passage Plan, he estimated Full Sea Speed (*i.e.*, 17.9 knots) and "[w]e always did that," even though he knew there would be fog and reduced visibility.  Trial Tr. 250-51.  He testified that it is "very usual" to have foggy conditions and "very common" to have restricted visibility in the TSS.  *Id.* 331.  The Cargo Claimants thus argue that the Tricolor's owners would have known of the Tricolor's speed through fog had they checked the vessel's transit times and logbook.

However, the Tricolor's culpability and causative role here did not depend on its speed alone.  The Second Circuit held that, as a matter of law, the Tricolor's speed of 17.9 knots was not safe "under conditions of heavy fog, in a TSS known for its traffic congestion, *with the knowledge the Kariba was on a collision course with the Clary*."  494 F.3d at 55 (emphasis added).  Therefore, what made the Tricolor's speed unsafe was not just the fog and the traffic congestion, but also Captain Knutsen's knowledge that the Kariba and the Clary were on a collision course.  Even if the Tricolor's owners knew that Captain Knutsen's sailed at 17.9 knots in fog in a heavily trafficked TSS, it would have been impossible for them to know that he would continue to sail at this speed with the knowledge that two other ships in his immediate vicinity were on a collision course.  The Cargo Claimants' citation to *The Lady Gwendolyn*, 1 Lloyd's Rep. 335, 335 (C.A. 1965), is therefore unavailing.  In that case, the UK court denied limitation under the United Kingdom's analogous limited liability law because the owners knew of the captain's "addiction to speed, which they should have restrained."  Here, however, it was not the

speed alone that made the Tricolor's acts negligent; it was the speed in the face of the other two ships' collision course.

In *Seiriki Kisen Kaisha*, cited favorably by the Second Circuit in *Otal II*, the court held that the Stena interests had sustained their burden of proving an absence of privity or knowledge. 629 F. Supp. at 1386. There, the Stena's managing agent knew of the lookout's practice of abandoning his station to check the engine room and call the next watch. The court, however, found that this provided no basis for concluding that the Stena interests "were privy to the continuance of such practices at the threshold of danger," "[e]ven if such testimony establishes privity or knowledge of these practices in normal circumstances." *Id.* at 1387. The court held, therefore, that the Stena interests could limit their liability pursuant to the Limitation of Liability Act. Similarly, here, even if the Tricolor interests knew of Captain Knutsen's propensity to sail at 17.9 knots in fog and traffic congestion, there is no basis for concluding that he would continue this practice "at the threshold of danger," with the knowledge that two other ships were on a collision course. Moreover, as the *Seiriki Kisen Kaisha* court observed with respect to the Stena's master and crew, the Tricolor's Captain Knutsen and crew had the requisite educational and experiential credentials for their positions. *See id.*

Despite the paucity of argument on this point supplied by the Tricolor's counsel, this Court finds that the Tricolor's owners did not know and were not privy to the Tricolor's navigational errors, unsafe overtaking and unsafe speed. The Tricolor's crew was well-trained and qualified. The Fifth Circuit in *Kristie Leigh Enterprises* held that the vessel's owners could limit their liability because "[o]ne who selects competent men . . . and who is not on notice . . . cannot be denied the benefit of . . . limitation" and noted that the captain was properly licensed with over thirty years of experience and a clean record except for one accident. 72 F.3d at 482 (quoting *Coryell v. Phipps,* 317 U.S. 406, 412 (1943)). Similarly, here, the Tricolor may limit its liability pursuant to the Limitation of Liability Act.[9]

---

[9] This case is distinguishable from cases in which courts have denied the limitation. For example, in *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1474 (5th Cir. 1991), the Fifth Circuit held that the vessel's owners could not limit their liability where there was evidence showing that the vice president and general manager knew that the masters operated the vessels in fog and on occasion accidents had resulted. Here, there is no evidence of any history of accidents by the Tricolor. In a case in this district, the court denied the limitation of liability to the vessel's owners where they failed to check the crew's credentials, furnish a lookout with no additional duties, replace the two crew members who had jumped ship, failed to furnish a large scale map of Bermuda and failed to ensure that their agent or one of their other officers could be reached by telephone for advice and direction before the vessel sailed.

Therefore, the liability of the owner of the Tricolor and her bareboat charterers is limited to "the value of the vessel and pending freight," 46 U.S.C. § 30505(b), valued as of the end of the voyage on which the loss or damage occurred. Carr, 191 F.3d at 4. Because the value of the Tricolor vessel at the end of the voyage, i.e., after the collision, was zero, the liability of the Tricolor's owner and bareboat charterers is reduced to the value of the freight earned on the voyage.

## F.      United States Carriage of Goods by Sea Act

The Tricolor also repeats the argument it made at trial that it is exonerated from liability to the Cargo Claimants by virtue of the error in navigation defense of COGSA. COGSA § 4(2)(a) provides that "[n]either the carrier nor the ship shall be responsible for loss or damage arising or resulting from . . . [the] [a]ct, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship . . . ." The Tricolor argues that COGSA § 4(1) also exonerates the carrier from liability because it exercised due diligence to make the ship seaworthy and ensured that the ship was properly manned, equipped and supplied, and made the holds, and all other parts of the ship in which the goods were carried, fit for their reception, carriage and preservation at or before the commencement of the voyage. The Tricolor bears the burden of proving the exercise of due diligence. COGSA § 4(1). Finally, the Tricolor argues that even if §§ 4(1) and (2) does not limit or exonerate it from liability, its liability should be limited to $500 per customary freight unit according to the COGSA package or customary freight unit limitation, pursuant to COGSA § 4(5).

COGSA "insulate[s] the *carrier* from liability to cargo for errors in navigation and management, as long as the shipowner has exercised due diligence in furnishing a seaworthy ship." Kasanin, *Cargo Rights and Responsibilities in Collision Cases*, 51 Tulane L. Rev. 880, 883 (1977); *see also* 46 U.S.C. § 1304(1) and 1304(2)(a) (emphasis added). Section 1(a) of COGSA provides that the term "carrier" means the owner or the charterer who enters into a contract of carriage with a shipper. Judge Hellerstein has explained that,

> [t]hus, where a relationship of privity exists as between the carrier and the cargo, the carrier will not be liable in tort, provided that the fault of the carrier in privity consists of an "act, neglect, or default . . . in the navigation or in the management of the ship." Instead, cargo must protect its interest through the terms of its contract with the vessel, or through insurance. . . .

*In re Delphinus Maritima, S.A.*, 523 F. Supp. 583, 595 (S.D.N.Y. 1981). No such blatant acts of negligence by the Tricolor's owners occurred here.

> . . . the true intent and purpose of COGSA may . . . be characterized as regulating the relationship between parties in privity, the cargo and the carrying vessel, requiring that cargo interests protect themselves from the possible grant of immunity through their contractual agreements with the carrying vessel or by procuring insurance coverage.

*Man Ferrostaal, Inc. v. M/V Vertigo,* 447 F. Supp. 2d 316, 321, 324 (S.D.N.Y. 2006) (quoting COGSA, § 1304(2)(a)).

Under COGSA, the usual procedure is that cargo must prove unseaworthiness of the vessel and causation; then, the burden shifts to the carrier to prove "due diligence" or lack of causation. *Seiriki Kisen Kaisha*, 629 F. Supp. at 1391-92 (citing *In re Flota Mercante Grancolombia, S.A.*, 440 F. Supp. 704, 725-26 & n. 9 (S.D.N.Y. 1977)). In *Potomac Transport,* the Second Circuit observed that, under COGSA, "[t]he shipowner . . . has the burden of demonstrating that it is exempt from liability to cargo claimants because an 'error of navigation,' rather than unseaworthiness of the vessel, was the cause of the damage to the cargo." 909 F.2d at 47.

Here, the Tricolor parties are exonerated from liability under COGSA for the same reasons that the Tricolor owner and bareboat charterers may limit their liability pursuant to the Limitation of Liability Act. The Tricolor parties could not have had privity or knowledge of the Tricolor's navigational errors, and the auditor found the ship to be seaworthy just weeks prior to the collision. The Tricolor parties therefore exercised due diligence in furnishing a seaworthy ship, and the damage resulted solely from the negligence of Captain Knutsen and his crew, not the negligence of the carrier.

Because a Notice of Appeal has been filed with respect to this Court's recent Opinion and Order in this case, it appears to me that to hold a hearing to determine open items such as claimants' damages or to appoint a special master to do so may, before the appeal is decided, be a waste of judicial time. On the other hand, if you believe that there are reasons to do it now, you have ten days to tell me. Conversely, if the parties consider such a hearing to be appropriate after the conclusion of the appeal, they are to let the Court know at that time.

## V. CONCLUSION

For the foregoing reasons, the liability for the collision is allocated as follows: the Kariba 63%, the Clary 20%, and the Tricolor 17%. The Clary may not limit its liability pursuant to the Limitation of Liability Act. The Tricolor's owner and bareboat charterers, however, may limit their liability to pending freight pursuant to the Limitation of Liability Act, and the Tricolor

parties are exonerated from liability under COGSA.

The clerk of the court is instructed to close any open motions.

**IT IS SO ORDERED.**
**New York, New York**
**June 2\_\_, 2008**

U.S.D.J.