UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
:
In re OTAL INVESTMENTS LTD., as Owner :
of the M/V Kariba for Exoneration from or :
limitation of liability. :
:
:
------------------------------------------------------------X

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/17/2013

OPINION & ORDER

03 Civ. 4304 (HB)

**HAROLD BAER, JR., United States District Judge:**

      On June 23, 2008, the Court issued an amended opinion and order following a remand from the Second Circuit. *See Otal Invs. Ltd. v. M/V CLARY*, No. 03 Civ. 4304, 03 Civ. 9962, 04 Civ. 1107, 2008 WL 2844019 (S.D.N.Y. June 23, 2008) ("*Otal III*"); *see also Otal Invs. Ltd. v. M/V CLARY*, 494 F.3d 40 (2d Cir. 2007) ("*Otal II*"). On March 8, 2012, the Second Circuit affirmed in part but vacated and remanded the question of whether the M/V CLARY's owners were entitled to a limitation of liability. *Otal Invs. Ltd. v. M/V CLARY*, 673 F.3d 108, 112 (2d Cir. 2012) ("*Otal IV*"). Familiarity with those opinions is assumed. Following the Second Circuit's decision in *Otal IV*, the parties resolved "the claims of Otal Investments Limited against Clary Shipping Pte. Ltd., MST Mineralien Schiffahrt Spedition und Transport GmbH, Mineral Shipping Co. Private Ltd. and the M/V CLARY, in rem," *In re Otal Invs. Ltd.*, No. 03 Civ. 4304 (S.D.N.Y. Oct. 11, 2013). The parties also informed the Court that they had agreed upon a damages and prejudgment interest calculation to be submitted following this Court's resolution of the remaining issues in this case. Thus, the only remaining issues for the Court to resolve in this matter are the individual liability of the M/V CLARY's managers, Mineral Shipping Co. Private Ltd. and MST Mineralien Schiffahrt Spedition und Transport GmbH (hereinafter "Managers"), and the availability of limitation to the M/V CLARY's owners (hereinafter "Owners").

## BACKGROUND

      Familiarity with the opinions listed above is assumed, and the facts are repeated here only to the extent they inform the remaining issues on remand. In the early morning of December 14, 2002, three ships sailing in the English Channel were involved in a collision with restricted visibility due to fog. *In re Otal Invs. Ltd. (Otal I)*, No. 03 Civ. 4304, 03 Civ. 9962, 04 Civ. 1107,

1

2006 WL 14512, at *1 (S.D.N.Y. Jan. 4, 2006). As a result of the collision, the M/V TRICOLOR sank and its cargo was lost.

The Court deemed the M/V CLARY partially responsible for this disaster. First, its failure to take avoiding action was a partial cause of the collision between the other two ships. Indeed, that failure violated the International Regulations for Preventing Collisions at Sea (the "COLREGS"), Oct. 20, 1972, 28 U.S.T. 3459, codified at 33 U.S.C. § 1602, *et seq.* Second, the Court also determined that the M/V CLARY violated COLREGS 2(a) and 5. In particular, COLREG 5 requires that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." *Id.* This failure also contributed to the accident. Further, at some point prior to trial, someone altered the M/V CLARY's logbook to reflect additional lookouts stationed on the bridge at the time of the accident. But in reality, only a single individual manned the bridge at that time. Coupled with the enhanced culpability reflected by this deception, the Court allocated 20% of the liability for the accident to the M/V CLARY interests. *Otal III*, 2008 WL 2844019, at *14. The Second Circuit did not disturb this allocation on appeal.

In assessing the relative liability of the parties, this Court also concluded that Second Officer Igor Toncic, the Watchkeeping Officer at this time and the lone individual on the bridge that morning, "was properly educated and trained and was fully qualified and competent." *Otal III*, 2008 WL 2844019, at *15. Owners' mandatory operating procedures also mandated the posting of additional lookouts during periods of restricted visibility. Specifically, those procedures required, *inter alia*, that an Able-Bodied Seaman ("AB") "shall be posted as Lookout as required by the Watch Condition which has been set and . . . [d]uring reduced visibility." (Trial Ex. 60, at CLARY 2043.) Indeed, per the onboard navigation manual, "[e]ven when circumstances permit the Watchkeeping Officer to be the sole lookout, he must maintain strict compliance with [COLREG 5]," including "anticipat[ing] . . . possible danger and taking appropriate action in time to prevent a dangerous situation developing." *Id.* The M/V CLARY's procedures also required that "[w]hen the Watchkeeping Officer is the sole look-out he must summon assistance (the AB on watch) to the bridge to relieve him of the duty of being a look out under circumstances which may divert his attention." *Id.* As this Court previously observed,

these procedures were contained in a manual kept on the M/V CLARY at all times. (Trial Ex. 55, at CLARY 158.)

To ensure that proper lookout procedures were followed, MST representatives inspected the M/V CLARY five to six times per year, along with conducting a more thorough annual audit. (Ruttman Dep. 32:8–16.) Among other areas, these audits focused on the crew's compliance with and knowledge of the navigational manuals. (Trial Ex. 313, at CLARY 2637 to CLARY 2646.) Lastly, the M/V CLARY's classification society, Lloyd's Register, also conducted an audit twice every five years. (Ruttman Dep. 105:13–106:2.) According to Jurgen Ruttman, MST's managing director, MST representatives also met weekly to discuss all of the ships under MST's purview. This review would have included discussing any problems identified during audits of the M/V CLARY. (Ruttman Dep. 26:5–27:6.) But no meeting minutes or other documentary evidence that these gatherings took place was produced at trial.

Yet MST's audits of the M/V CLARY were flawed. First, auditors that year were not initially aware of the M/V CLARY's involvement in the collision between the M/V TRICOLOR and the M/V KARIBA, despite the audit occurring just days after that event. Indeed, on December 19, five days after the collision, MST auditors noted that "entries in the CM logbook are conducted as per company's requirements." (Trial Ex. 313, at CLARY 2642.) Thus, these auditors also apparently did not discover the alteration of the December 14 logbook entries. And regarding lookouts, MST auditors also noted that the crew recorded "use of the 'Restricted Visibility' Checklist." (*Id.*) This checklist required posting of an AB lookout in restricted visibility conditions like those in the early morning hours of December 14. (Trial Ex. 60, at CLARY 2078.) But records of these checklists were apparently destroyed prior to trial. And neither the M/V CLARY's master, chief mate, nor any MST auditor submitted any sworn testimony at trial to explain these discrepancies.

To be sure, Toncic testified that an AB was "usually" present during the evening watch along with an officer. (Trial Tr. 500:11–18.) Yet he also stated that "sometimes" there was no AB stationed as a lookout, including when the collision occurred. (Trial Tr. 498:23–25; Toncic Decl. ¶ 9.) And Toncic also admitted that the M/V CLARY's logbook had been altered both to indicate clear visibility conditions and to list three men on deck at the time of the accident. *Otal II*, 494 F.3d at 49. As noted above, neither of these notations were accurate.

3

## DISCUSSION

### A. Managers' Liability

The Court turns first to Managers' liability. The parties offer opposing interpretations of the Court's June 23, 2008 opinion in *Otal III* as to whether the Court already found Managers liable. But the plain language of that opinion indicates that the Court found liability against Managers. Indeed, the Court made clear that "the Clary [was] 20% liable." *Otal III*, 2008 WL 2844019, at *1. That "Clary" appellation was defined as "the owners and other companies affiliated with the M/V Clary," including "Clary Shipping Pte. Ltd., MST Mineralien Schiffahrt Spedition and Transport GmbH, [and] Mineral Shipping Co. Private Ltd." *Id.* at *1 n.1. And the Court also observed that Managers "may not limit their liability" under the Limitation of Liability Act because they "are not owners or bareboat charterers." *Id.* at *14 n.8. Read together, the Court thus found Managers as well as the other M/V CLARY's interests jointly liable. This finding is therefore the law of the case. *See Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 378 (S.D.N.Y. 2009) ("Under the law of the case doctrine, 'a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation.'" (quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991))).

Yet Managers now urge that because the Court did not discuss the standard for imposing liability upon them, that finding cannot stand. Managers also made this same argument on appeal, urging that "the district court merely 'classified both the Owners and the vessel managers as one' and the acts of negligence found by the lower court were linked to the responsibility of the owners, not the managers." *Otal IV*, 673 F.3d at 120. But because Managers failed to raise previously this issue with this Court before they appealed, the Second Circuit "decline[d] to consider" this argument "in light of the well-established general rule that a court of appeals will not consider an issue raised for the first time on appeal." *Id.*

Managers now press this argument for the first time in this Court. The various cargo claimants and the owner of the M/V KARIBA respond that the law of the case mandates a finding that Managers are liable. But that doctrine does not preclude the Court's reconsideration of this issue at this late stage. Indeed, while "the district court is obliged, on remand, to follow the decision of the appellate court" where an issue "ha[s] been explicitly or implicitly decided on appeal," that is not the case here. *See Burrell v. United States*, 467 F.3d 160, 165 (2d Cir. 2006)

4

(quoting *United States v. Minicone*, 994 F.2d 86, 89 (2d Cir. 1993)). Rather, as noted above, the Second Circuit expressly avoided resolving Managers' claim. Thus, this Court retains "the discretion to determine whether its prior determination on an issue should be disturbed." *Am. Hotel Int'l Grp.*, 611 F. Supp. 2d at 379 (citing *In re PCH Assocs.*, 949 F.2d at 593).

Nevertheless, while not foreclosed from doing so, the law of the case doctrine still "counsels against" reconsideration of a previous decision. *Id.* Under that doctrine, "the principal bases for departure from a prior ruling include 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Laurent v. PriceWaterhouseCoopers LLP*, No. 06 Civ. 2280, 2013 WL 4028181, at *2 (S.D.N.Y. Aug. 8, 2013) (quoting *Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983)). Here, the parties do not point to any changes in law or new evidence. Rather, Managers urge that any finding of liability against them is clearly erroneous because that issue was not properly before the Court and, therefore, the Court failed to apply the correct standard.

But Managers raise this argument too late. Indeed, Managers have been named Defendants in the third-party complaint against them since at least December 17, 2003. And in their papers prior to the bench trial in this action, the owners of the M/V KARIBA asked for liability to be apportioned to Managers on the same lines as the other M/V CLARY interests. (Brief for Otal Invs. Ltd. at 2 n.2, 12, *In re Otal Invs. Ltd.*, No. 03 Civ. 4304 (S.D.N.Y. Oct. 7, 2005).). Following the Second Circuit's first remand in 2007, cargo claimants also asked specifically that the Court find liability against the M/V CLARY "along with [its] owners, charterers and <u>managers</u>." (Reply Brief for Cargo Claimants at 23, *In re Otal Invs. Ltd.*, No. 03 Civ. 4304 (S.D.N.Y. Jan. 11, 2007) (emphasis added).) Yet despite multiple parties grouping Managers with the rest of the M/V CLARY interests, Managers do not explain their failure to argue until now that the Court should consider them separately. The Court declines to reopen consideration of that issue as it was raised for the first time after this Court had already issued its liability findings. *See Richard Feiner & Co., Inc. v. BMG Music Spain*, No. 01 Civ. 0937, 2003 WL 21496812, at *1 (S.D.N.Y. June 27, 2003) ("[P]laintiff is advancing new arguments without excuse as to why these argument were not raised previously, and these arguments are therefore not cognizable on a motion for reconsideration.").

Nor is it clear error to find Managers liable. *See Am. Hotel Int'l Grp.*, 611 F. Supp. 2d at 379–80 (finding no clear error or manifest injustice in refusing to reconsider law of the case

where prior ruling had not been challenged until after appeal). Indeed, the Second Circuit held that the M/V CLARY violated COLREGS 2(a) and 5 "in staffing its bridge with a lone mariner" as well as COLREG 19(d) when it failed "to take avoiding action promptly." *Otal II*, 494 F.3d at 56–57. These COLREG violations "helped to cause the collision." *Otal III*, 2008 WL 2844019 at *16. And the sole individual manning the M/V CLARY's bridge at the time of the accident, Second Officer Toncic, "admitted that 'someone' had altered his logbook pages" to mask the bridge's understaffing. *Id.* *8–9 (quoting *Otal II*, 494 F.3d at 58). It is not clear error to conclude that these findings also impute liability to Managers, particularly given Managers' failure to address their individual liability and their overall responsibility for the operation of the M/V CLARY. *See Quinn v. Southgate Nelson Corp.*, 121 F.2d 190, 191 (2d Cir. 1941) (finding manager "responsible for the acts of the master, officers, and crew" where "[i]t had a most substantial measure of control over the operation of the vessel"); *see also Johnson v. Holder*, 564 F.3d 95, 100 (2d Cir. 2009) (no clear error where issue was "not of such a character as to obviously compel a result contrary to the one reached"). Indeed, MST's managing director testified that there was not "any part of the management of the ship that CLARY did not appoint MST as management for." (Ruttman Dep. 15:2–11.) I therefore decline to overturn Managers' liability at this stage.

### B. M/V CLARY Owners' Limitation of Liability

I turn next to whether the M/V CLARY's owners may limit their liability under the Limitation of Liability Act, 46 U.S.C. § 30505, following the Second Circuit's remand. Under that statute, "the owner's liability is limited to the value of the ship," including pending freight, "unless the owner himself had 'privity or knowledge' of the negligent acts." § 30505(a); *Otal IV*, 673 F.3d at 115 (quoting *In re City of N.Y.*, 522 F.3d 279, 283 (2d Cir. 2008)). But if Owners had "privity or knowledge," then they are liable "for the full extent of any [damages] caused by the negligence of the captain or crew employed to operate the ship." *Otal IV*, 673 F.3d at 115 (alteration in original) (quoting *In re City of N.Y.*, 522 F.3d at 283); *see* § 30505(b). This analysis requires first determining "what acts of negligence . . . caused the accident." *Otal IV*, 673 F.3d at 115 (alteration in original) (quoting *In re Moran Towing Corp.*, 166 F. Supp. 2d 773, 775 (E.D.N.Y. 2001)). Then, "the court must determine whether the ship owner had knowledge or privity of those same acts of negligence." *Id.* (quoting *In re Moran Towing Corp.*, 166 F. Supp. at 775). Once a cargo claimant proves negligence, "the burden shifts to the

shipowner to prove lack of knowledge or privity." *Id.* (quoting *In re Moran Towing Corp.*, 166 F. Supp at 775). Regarding the first prong, Cargo Claimants have already proved negligence in this case. Indeed, the Second Circuit accepted the Court's allocation of liability among the vessel parties, including the finding that the M/V CLARY's negligent operation partially caused the collision. *Id.*

I turn then to the second prong. Because cargo claimants do not argue that Owners "knew that the Clary failed to take avoiding action promptly," the Second Circuit instead focused upon the Court's finding that Owners knew of the failure to post sufficient lookouts. *Id.* at 115 n.2. In reaching that conclusion, this Court had previously relied on the lack of overtime records for lookouts as supporting constructive knowledge. But the Second Circuit held that the evidence at trial did not permit an inference that all lookouts would necessarily have been paid overtime. Because lookouts could have been posted without overtime being recorded, the Second Circuit directed the Court to reconsider the issue of Owners' knowledge of negligence aboard the M/V CLARY, free from any erroneous inferences previously drawn from the lack of overtime records. *Id.* at 118-19.

Limitation is thus available only if Owners have met their burden of establishing that they "were without knowledge of the negligence that contributed to the collision": *i.e.*, that the M/V CLARY failed to keep proper lookouts. *Id.* at 119. Where "the shipowner is a corporation" like Owners here, "privity and knowledge means 'privity and knowledge by a managing agent, officer, or supervising employee of a ship.'" *Id.* at 115 (quoting *Otal III*, 2008 WL 2844019, at *15). But privity or knowledge "can be actual or constructive," and is present where "the exercise of reasonable diligence could have prevented the commission of the act." *Id.* (quoting *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir. 1999)); *In re Moran Towing Corp.*, No. 10 Civ. 4844, 2013 WL 6068454, at *26 (S.D.N.Y. Nov. 18, 2013) (limitation unavailable where owner "'should have known' of the breach" (quoting *In re Marine Sulphur Queen*, 460 F.2d 89, 101 (2d Cir. 1972))). Thus, "[t]he question with regard to corporate owners is not what the corporation's officers and managers actually knew, but what they objectively ought to have known." *In re Moran Towing Corp.*, 2013 WL 6068454, at *26 (quoting *In re Patton-Tully Transp. Co.*, 797 F.2d 206, 211 (5th Cir. 1986)).

### 1. Competence of the Crew

Owners first urge that because Second Officer Toncic was competent, they cannot be charged with knowledge or privity of any negligence or navigational errors on his part. But without more, that fact alone does not entitle Owners to limitation. Indeed, that argument is foreclosed by implication from the decision in *Otal IV*. There, the Second Circuit noted expressly this Court's finding that Toncic was "properly educated and trained and was fully qualified and competent." *Otal IV*, 673 F.3d at 119 (quoting *Otal III*, 2008 WL 2844019, at *15). Yet the Second Circuit still remanded for a determination of whether the "conflicting inferences" to be drawn from the evidence demonstrated that Owners' had met their burden of demonstrating lack of knowledge. *Id.* Toncic's competence thus does not automatically entitle Owners' to limitation.

Cases stating that a competent captain's negligence "are not within the knowledge or privity of the owner" do not suggest a different conclusion. *See, e.g.*, *In re Sea Wolf Marine Towing & Transp., Inc.*, No. 03 Civ. 5578, 2007 WL 3340931, at *3–4 (S.D.N.Y. Nov. 6, 2007). Indeed, while mere negligence of a competent crew alone is insufficient to pierce an owner's right to limitation, an owner's knowledge or privity can still be demonstrated in other ways. *See id.* (noting captain's competence but weighing whether other evidence demonstrated knowledge); *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 952 (3d Cir. 1985) (noting that limitation is unavailable where "management knew or should have known of the master's regular and consistent practice of" understaffing watches). It is not remarkable to require Owners to exercise proper supervision and inspection practices, even when they employ competent officers. *See In re Moran Towing Corp.*, 2013 WL 6068454, at *26 (noting "recent trend has been to enlarge the scope of activities within the 'privity or knowledge' of the shipowner, including . . . requiring shipowners to exercise an 'ever-increasing degree of supervision and inspection'" (quoting *In re Oil Spill by Amoco Cadiz Off the Coast of France on March 16, 1978*, 954 F.2d 1279, 1303 (7th Cir. 1992))); *see also Otal IV*, 673 F.3d at 115 ("Both privity and knowledge 'turn[] on the facts of particular cases.'" (alteration in original) (quoting *Coryell v. Phipps*, 317 U.S. 406, 411 (1943))); *In re Seiriki Kisen Kaisha & Dragon Navigation, S.A.*, No. 82 Civ. 2718, 1986 WL 2466, at *9 n.19 (S.D.N.Y. Feb. 19, 1986) ("[T]he mere fact that a vessel owner gives instructions to its crew is insufficient to prove the lack of privity and knowledge since a shipowner has a duty to insure that its directives are being followed by

8

making inspection and inquiry." (quoting *In re Hercules Carriers, Inc.*, 566 F. Supp. 962, 981 (M.D. Fla. 1983))).

Nor does the master's competence affect the outcome of this case. Even if the master's competence alone could resolve the limitation issue, Owners did not provide evidence demonstrating his competence. *But see Otal IV*, 673 F.3d at 119 (availability of limitation still an open question even if master were competent). Indeed, the master did not testify at trial, nor did Owners provide any evidence of his qualifications. The Court did not conclude otherwise in *Otal III*. *See Otal III*, 2008 WL 2844019, at *15 (describing but not expressly adopting Owners' argument that "they selected a competent master"). On the other hand, Cargo Claimants also did not meet their burden of demonstrating the master's incompetence or that the M/V CLARY was otherwise unseaworthy. *See In re Guglielmo*, 897 F.2d 58, 61 (2d Cir. 1990) (claimants' burden to "establish either that the vessel was unseaworthy—for instance, being operated by an incompetent crew—or that the accident was caused by negligence" (internal citations omitted)). With neither party meeting their respective burdens as to the master's competence, that issue does not affect the availability of limitation here.

### 2. Owners' Knowledge of Understaffing Lookouts on the M/V CLARY

Instead, the proper focus on remand, as the Second Circuit noted, is whether Owners' operating procedures and other safeguards indicate that they did not have knowledge or privity of the M/V CLARY's failure to post adequate lookouts under the COLREGS. The unexplained alteration of the M/V CLARY's logbook is informative in that regard. As noted in *Otal II*, alterations in a ship's logbook "should give rise to a presumption the logbook contained entries adverse to the vessel's contentions at trial." *Otal II*, 494 F.3d at 58. While the Court does not conclude that Owners knew of the inadequate lookouts on this basis alone, this admitted alteration leads to the inference that the M/V CLARY often operated without necessary lookouts. *See id.* at 59 (noting that "[i]n some cases an issue might arise as to whether the fact of an alteration gives rise to a presumption that facts, other than those concealed by the alteration, are adverse to the party responsible for the alteration").

That alteration and the likelihood of others also calls into question Toncic's credibility regarding his testimony that lookouts were "usually" staffed properly aboard the M/V CLARY. (Trial Tr. 500:11–18.) According to Toncic, he "routinely acted as Watchkeeping Officer on the bridge" of the M/V CLARY. (Toncic Decl. ¶ 8.) Yet Toncic also acknowledged that on this

9

particular voyage, he "always held . . . watch" alone and that "[t]here are times when there's no able body who is looking out at the bow." (Trial Tr. 498:23–499:9.) But for every log entry from December 1, 2002 to December 14, 2002—the length of the M/V CLARY's voyage—an additional lookout is listed in the logbook as keeping watch. (*See* Toncic Decl. ¶ 7; Trial Ex. 52, at CLARY 0041 to CLARY 0054.) These entries directly contradict Toncic's testimony that he "always" kept watch alone. Thus, not only were sole watches on the bridge apparently a regular occurrence at least whenever Toncic held watch, but the logbook also apparently contained more false entries than just those from December 14. The record thus supports the conclusion that lookouts were regularly understaffed aboard the M/V CLARY.

Nor have Owners met their burden of proving that they lacked knowledge and privity regarding this regular understaffing. First, Owners' reliance on the positive results of MST's audits to prove lack of knowledge is misplaced. In that regard, the Court previously noted its concern regarding Owners' "diligence" due to their failure to "inform their auditor that the Clary had recently reacted to and then sailed around a major collision." *Otal III*, 2008 WL 2844019, at *16. Toncic, the sole individual on the bridge and the person who ignored the distress calls immediately following the accident, admitted that he "did not report to the safety auditor" and he "[didn't] know . . . if anybody else did." (Trial Tr. 467:11–468:19, 497:24–498:4.) And the auditors failed to discover the M/V CLARY's involvement independently. Thus, regardless whether Owners themselves knew of the collision at the time of the December 19 audit, these flaws in the audit process demonstrate that reliance on those audits does not satisfy Owners' burden of proving lack of knowledge.

Indeed, reasonable diligence by Owners and the auditors they employed may have revealed the habitual practice of staffing a sole lookout on the bridge. For example, testimony from MST's managing director showed that auditors would have been able to "cross reference . . . labor sheets, working hours of crew members and so on" with the logbooks to verify the logbooks' accuracy. (Ruttman Dep. 77:22–78:9.) Yet there is no evidence that any auditors ever examined these records to confirm that the proper number of lookouts were where they should have been when they should have been. Thus, the Owners have failed to establish that reasonable efforts with respect to the lookouts could not have prevented the M/V CLARY's involvement in the December 14 collision. *See Otal IV*, 673 F.3d at 115 (noting that privity or knowledge exists where owners' "reasonable diligence could have prevented" the negligent act).

The lack of testimony from key witnesses who could have shed light on Owners' policing of lookouts aboard the M/V CLARY—including the M/V CLARY's master, chief mate, or the auditor following the collision—reinforces Owners' failure to meet their burden. The Court may draw a negative inference against Owners due to these witnesses' absences. *See United States v. Rabbani*, 382 F. App'x 39, 41 (2d Cir. 2010) ("[W]hen a witness is equally available to both sides, the failure to produce is open to an inference against both parties." (alteration in original) (quoting *United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988))). Indeed, all three of these possible witnesses were employed by one of the interests associated with the M/V CLARY, making a negative inference even more appropriate. *See Sagendorf-Teal v. Cnty. of Rensselaer*, 100 F.3d 270, 275 (2d Cir. 1996) ("Whether a witness is equally available depends . . . on all the facts and circumstances bearing on the relationship of the witness to the parties." (citing *Torres*, 845 F.2d at 1170)). These witnesses could have provided clarity with respect to the nature of the M/V CLARY's audits, the actual practice regarding staffing of lookouts beyond the prescribed procedures, and the training and instruction provided to Second Officer Toncic with respect to lookouts. And by failing to call these witnesses, Owners leave the Court to speculate as to whether reasonable diligence would have ensured conformity with the lookout procedures they had implemented.

Testimony from MST's managing director, Jurgen Ruttman, further illustrates why these witnesses would have aided in the Court's analysis. Owners ask the Court to conclude that the M/V CLARY's auditors scrupulously performed their duties, despite their failure to ascertain the M/V CLARY's involvement in the December 14 collision. Yet even Ruttman could not describe the nature of the inspections that the auditors performed, particularly regarding the logbooks and the record of lookouts posted. Instead, Ruttman noted that "it's up to the discretion of the person going on board the ship" to decide the scope of the examination of the logbooks. (Ruttman Dep. 77:22–78:9.) Indeed, according to Ruttman, auditors generally do not "verify what has been filled out [in ship logbooks] is correct." (Ruttman Dep. 77:13–21.) Without any witness available to clarify this apparent lack of oversight, coupled with the evidence described above indicating that reasonable measures to discover the improper lookout practice were available but not taken, Owners are not entitled to limitation here.

## CONCLUSION

The Court has considered the parties' remaining arguments and finds them meritless. For the reasons stated above, the Court declines Managers' invitation to revise the original liability finding against them. The Court also concludes that Owners are not entitled to limitation under the Limitation of Liability Act. In addition, the parties advised the Court on September 19, 2013 that they had resolved all remaining quantum of damages issues without court intervention. The Court therefore directs the parties to "submit to the Court a stipulation confirming the total amount of recoverable damages with prejudgment interest" within five days of this order, in accordance with the parties' agreement, along with a proposed judgment.

**SO ORDERED.**

Date: Dec 17, 2013
New York, New York

HAROLD BAER, JR.
**United States District Judge**